The ATCHISON, TOPEKA AND SANTA
FE RAILROAD COMPANY et al.,
Plaintiffs,

Chicago, Burlington & Quincy Railroad
Company and The Colorado and South-
ern Railway Company, Intervening
Plaintiffs,

v.

UNITED STATES of America and Inter-
state Commerce Commission,
Defendants,

The Baltimore and Ohio Railroad Com-
pany et al., Intervening Defendants,
Chicago and North Western Railway
Company et al., Intervening
Defendants.

Civ. A. No. 7826.

United States District Court
D. Colorado.

Jan. 16, 1964.

Grant, Shafroth, Toll & McHendrie, Douglas McHendrie, Denver, Colo., Sidley, Austin, Burgess & Smith, Douglas F. Smith, Howard J. Trienens, George L. Saunders, Jr., Chicago, Ill., for plaintiffs, and S. R. Brittingham, Jr., Chicago, Ill., Frank S. Farrell, St. Paul, Minn., Ernest Porter, Denver, Colo., Howard E. Roos, Portland, Or., and L. E. Torinus, Jr., St. Paul, Minn., of counsel.

J. C. Street, Denver, Colo., for Chicago, Burlington and Quincy Railroad Co. and Colorado and Southern Railway Company, intervening plaintiffs.

Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., and Lawrence M. Henry, U. S. Atty., for D. of Colo., Denver, Colo., for the United States.

Robert W. Ginnane, Gen. Counsel, Stanton P. Sender, Atty., Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Holland & Hart, Josiah G. Holland, James T. Moran, Denver, Colo., for intervening defendants Baltimore and Ohio Railroad Co. and others.

E. R. Leigh, Louisville, Ky., for intervening defendant Louisville and Nashville Railroad Co.

Kenneth H. Lundmark, New York City and Joseph F. Eshelman, Philadelphia, Pa., for said intervening defendants other than Louisville and Nashville Railroad Co. Andrew C. Armstrong, Baltimore, Md., Kemper A. Dobbins, Cleveland, Ohio, John W. Hanifin, Richmond, Va., Edward A. Kaier, Philadelphia, Pa., M. C. Smith, Jr., Cleveland, Ohio, and Donald M. Tolmie, Chicago, Ill., of counsel.

William V. Hodges, Jr., Denver, Colo., Nye F. Morehouse, Chicago, Ill., and Bryce L. Hamilton, Chicago, Ill., for Chicago and North Western Ry. Co. and others, intervening Western Trunk Line defendants. Martin L. Cassell, Chicago, Ill., John E. McCullough, Robert H. Stahlheber, St. Louis, Mo., Hodges, Silverstein, Hodges & Harrington, Denver, Colo., and Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel.

Before SETH, Circuit Judge, and ARRAJ and DOYLE, District Judges.

DOYLE, District Judge.

This is an action to enjoin, set aside, annul and suspend an order entered by the Interstate Commerce Commission in administrative proceedings identified as I.C.C. Docket No. 31627. The report in the administrative proceedings, decided May 7, 1962, is found at 316 I.C.C. 351.

The underlying controversy giving rise to these proceedings was a dispute, initiated by the eastern railroads, as to the lawful and proper division of revenues produced by freight traffic moving between stations on the lines of the transcontinental western railroads located in Western Trunk Line territory and stations on the lines of the eastern railroads located in Official territory. Official territory is located, generally, east of the Mississippi River and north of the Ohio River. Western Trunk Line territory is located, generally, west of the Mississippi River, north of Oklahoma and east of the Rocky Mountains and Montana. The transcontinental western railroads also operate in Mountain-Pacific territory and Southwestern territory. The railroads which are parties to this action can conveniently be classed in four separate groups:

1. The plaintiffs are the *transcontinental western railroads* (respondents before the Commission). They operate in the western portion of Western Trunk Line territory and in Mountain-Pacific and Southwestern territory. Divisions of revenues between these carriers and the eastern carriers, which were complainants in the administrative proceedings, had been made on the basis of a schedule known as the 500–A divisions schedule. This schedule was established by agreement between the carriers involved on October 1, 1939. That divisions schedule was declared unlawful in the proceedings here under scrutiny— the 28277 divisions schedule being substituted in its stead by Commission order.

2. The *six midwestern railroads* which never assented to the application of the 500–A divisions schedule to traffic originating or terminating at stations on their lines, along with other midwestern lines, are nominal defendants in this action, but were respondents in the administrative proceedings. These carriers, which refused to accept the agreed-upon 500–A schedule, induced the Commission to prescribe a different divisions schedule, the 28277 schedule, to apply to traffic interchanged between the eastern lines and themselves. The proceedings in Docket No. 28277, begun in 1939, on the basis of pre-war data, were not concluded until 1948, when the 28277 divisions schedule was prescribed only for traffic interchanged between the six midwestern carriers and the eastern lines.

3. *Some thirty other midwestern lines* which assented to the 500–A divisions schedule when it was originally promulgated, and which were active respondents in the proceedings before the Commission until they concluded an agreement with the eastern lines on October 4, 1955, are intervening defendants in this action. By the agreement of October 4, 1955, the midwestern carriers accepted the 28277 divisions schedule and agreed that it should thenceforth apply to traffic interchanged between all midwestern carriers and the eastern carriers.

4. *The eastern lines* were complainants in the proceedings instituted before the Commission in 1954, praying the Commission to declare unlawful both the 500–A divisions schedule which applied to most of the traffic moving between Official territory and Western Trunk Line territory and the 28277 divisions schedule which applied to traffic interchanged between the eastern lines and six of the midwestern lines. The eastern lines are the active defendants in this action, having intervened in the suit brought against the United States

and the Interstate Commerce Commission.

The main adversaries here are the transcontinental western lines and the eastern lines. On October 4, 1955, after additional complaints, answers and cross-complaints had been filed in the Commission proceedings, but before hearings had begun, the eastern railroads entered into an agreement with thirty-six midwestern carriers which specified that the 28277 schedule should apply to all traffic originating and terminating on their lines. Since the transcontinental western carriers would not agree to the substitution of the 28277 schedule for the pre-existing 500–A schedule, the proceedings before the Commission continued. At hearings before Examiners the evidence presented by the complainant eastern lines was limited to the traffic not subject to the October 4, 1955 agreement. The traffic subject to the 1955 agreement comprised approximately seventy-three per cent. (73%) of all Official-Western Trunk Line traffic. The complaint of the eastern lines put in issue, however, the divisions applicable to all Official-Western Trunk Line traffic, and the pleadings in the proceedings before the Commission were never amended to reflect the fact that, so far as the eastern lines were concerned, only the twenty-seven per cent. (27%) of the Official-Western Trunk Line traffic which originated or terminated at stations on the transcontinental western lines remained in issue. So far as the transcontinental western lines were concerned, the cross-complaint which they filed in the administrative proceedings put in issue and kept in issue the lawfulness of divisions applicable to all Official-Western Trunk Line traffic. During the course of the proceedings before the Commission the transcontinental western lines proffered evidence showing the average length of haul, volume of traffic, division of revenues and other facts relating to the traffic subject to the October, 1955 agreement. Such evidence was excluded by the Commission as irrelevant.

It is the contention of the transcontinental western lines, plaintiffs here, that their proffered evidence was relevant because:

1) within the scope of the unamended pleadings the divisions applicable to the traffic covered by the 1955 agreement (in which they had a competitive interest) remained in issue; and because

2) such information was relevant to the continuing controversy (relating to the remaining twenty-seven per cent. of Official-Western Trunk Line traffic) between them and the eastern lines even if divisions on the traffic subject to the October, 1955 agreement no longer needed to be prescribed by the Commission.

Plaintiffs maintain that information relating to the traffic covered by the 1955 agreement continued to be relevant to the narrower controversy between the eastern lines and the transcontinental western lines because the Commission based its determination that the 28277 divisions schedule should be extended to cover the traffic not subject to the 1955 agreement largely, if not wholly, on the ground that:

1. It could be inferred from the fact that the midwestern lines assented to the 28277 divisions schedule that it would be just and reasonable to extend that divisions schedule to cover eastern-transcontinental traffic as well. This because midwestern lines and transcontinental lines operated under like conditions in Western Trunk Line territory.

The defendants in this action argue further that a plausible reason for extending the 28277 schedule to cover eastern-transcontinental traffic is that:

2. It would be desirable to prescribe divisions for eastern-transcontinental traffic which were identical with divisions for eastern-midwestern traffic since some territory was served both by midwestern lines and by transcontinental lines.

It is to be noted, however, that the Commission had deliberately created this multiplicity of schedules in 1948, presumably on the basis of a finding that a uniform divisions schedule applicable to all carriers in Western Trunk Line territory was not necessary or desirable.

The transcontinental western carriers contend here that the Commission's adoption of the 28277 schedule for eastern-transcontinental traffic was improper, prejudicial and unlawful for several reasons, among them, that the evidence which the Commission had before it did not include any evidence showing that the conditions under which midwestern railroads operated were like or unlike the conditions under which the transcontinental western railroads operated in Western Trunk Line territory. The Commission erred, argue the plaintiffs, by excluding and refusing to consider tendered evidence which allegedly would have established that the effects of the adoption of the 28277 divisions schedule on the midwestern railroads and the transcontinental western railroads, respectively, were exactly opposite.

It is undisputed that the net effect of the Commission order is to transfer roughly $3,000,000 annually from the carriers operating in Western Trunk Line territory, collectively, to the eastern carriers, collectively. The Commission said in its report:

"From the best available data it is estimated that upon a traffic volume of May 1953 prescription of the 28277 scale would increase complainants' revenue by about three million dollars annually." 316 I.C.C. at 362

This excluded evidence, allege the plaintiff carriers, would have shown that the actual effect of the 28277 schedule is to increase the revenues of the midwestern railroads as well. If this is true, obviously, any Commission inference that the 28277 basis could reasonably be extended to eastern-transcontinental traffic in view of the fact that the midwestern railroads had voluntarily agreed to have that schedule apply to eastern-

midwestern traffic would be palpably unwarranted.

All traffic here in issue, on any view of the case, either originates in Official territory and terminates in Western Trunk Line territory, or vice versa. The Official-Western Trunk Line primary divisions—the only divisions here in issue —are determined by calculating the mileage over which the shipment moves, respectively, in territory east and west of the boundary between Official territory and Western Trunk Line territory.

As respects the twenty-seven per cent. (27%) of Official-Western Trunk Line traffic which either originates or terminates at stations on the transcontinental western lines, the share of the joint rate which the transcontinental western line receives is determined in the first instance by the length of the total haul between the Mississippi River and the station on the transcontinental western line.

The 28277 divisions schedule basically provides that the carriers who participate in the longer of the two primary hauls (here, typically, the haul west of the Mississippi) shall receive proportionately less per mile than the carriers who participate in the shorter of the two primary hauls. When the total haul west of the Mississippi, then, is longer than the total haul east of the Mississippi, the lines in Western Trunk Line territory receive proportionately less than the lines in Official territory. Even when the haul made by a transcontinental western line is physically a short haul (e. g., all hauls made by the Denver and Rio Grande Western Railroad in Western Trunk Line territory) the portion of the joint rate which the transcontinental western carrier receives under the 28277 divisions schedule is a fraction of the proportionately smaller long haul primary division —the other portion of the long haul primary division going, typically, to an intermediate midwestern carrier.

The plaintiffs allege that the Commission erred in that it did not take cognizance of the fact that the traffic covered by the 1955 agreement between the

eastern and midwestern lines was primarily traffic in which the midwestern lines received the proportionately greater short haul primary division because that traffic, on the average, moved a greater distance east of the Mississippi in Official territory than it moved west of the Mississippi in Western Trunk Line territory.

The traffic originating or terminating at stations on the transcontinental western railroads, on the other hand, is alleged to be traffic on which the lines in Western Trunk Line territory received the proportionately lesser long haul primary division because that traffic, on the average, moved a greater distance west of the Mississippi in Western Trunk Line territory than it moved east of the Mississippi in Official territory.

It is alleged that the net effect of the adoption of the 28277 schedule by the midwestern lines was to increase their revenues on joint traffic. It does not appear to be disputed that the net effect of the Commission's imposition of that same 28277 divisions schedule on the transcontinental western lines is to decrease their revenues on joint traffic— over and above the amount such revenues are reduced by the elimination of any inflation in favor of any carriers operating in Western Trunk Line territory.

In the administrative proceedings the brief submitted by the midwestern lines made the point that the traffic for which the Commission has here prescribed a new divisions schedule is primarily long haul traffic. It is the same point which the transcontinental western lines now press:

> "Neither the Eastern lines nor the Transcontinental Group developed actual average hauls [in their traffic studies]. The Eastern lines' study, however, does show average short-line hauls of 528 miles east and 575 miles west of the gateways. Although the Western railroads have the longer average haul on [the eastern-transcontinental traffic], the Eastern lines have the longer aver-

age haul on the much larger volume of [eastern-midwestern] traffic covered by [the October 1955 agreement].

> "The longer average haul of the Western lines on the [eastern-transcontinental] traffic is undoubtedly due to the fact that in Official Territory the greater part of such traffic originates or terminates in the area west of Buffalo and Pittsburgh, and to the fact that in Western Trunk Line Territory the greater part of such traffic originates or terminates west of the Missouri River and the Twin Cities. The Eastern lines' study shows that 62.8 percent of the involved traffic, measured by tons, originated or terminated in Central Territory. The study also shows that in Western Trunk Line Territory 43.6 per cent of the tons originated or terminated on lines whose operations are west of the Missouri River and the Twin Cities; and that 18.2 percent originated or terminated on the Santa Fe, and 37.3 percent on the Burlington. The Santa Fe and the Burlington have very extensive operations west of the Missouri River in Western Trunk Line Territory, and it is reasonable to assume that an important part of the traffic which originated or terminated on their lines is traffic whose origin or destination was west of the Missouri River." Brief dated December 5, 1960, page 19. Quoted in Plaintiffs' Reply Brief in the instant action, dated April 15, 1963, page 39.

Even conceding that Commission possesses wide discretion to declare existing divisions unlawful—and prescribe new divisions in their stead—the plaintiffs contend that the actions taken by the Commission here are not properly within the Commission's discretion and thus can not stand. The plaintiffs' major objections to the Commission's order are two. These we shall consider in turn:

A. The Commission could not validly declare the pre-existing 500–A

divisions schedule unlawful on the basis of the evidence which it considered. It is abundantly clear, allege the plaintiffs, that the "typical evidence" rule requires the Commission in divisions cases to consider certain types of evidence which were not in the record in this case and which were not shown to have been considered otherwise by the Commission in making its determination.

B. Even if the Commission's invalidation of the pre-existing 500-A divisions schedule had been lawful, it could not lawfully have prescribed the 28277 schedule to cover the eastern-transcontinental traffic in issue on the basis of the evidence which was before it. The Commission wilfully excluded, to the prejudice of the plaintiffs, the only evidence tendered which would have shown that the conditions under which the midwestern lines and the transcontinental lines operated in Western Trunk Line territory were either like or unlike. The Commission thus prevented the plaintiffs from showing the effect which prescription of the 28277 schedule would have on the different groups of Western Trunk Line carriers.

A. *The Typical Evidence Rule*

At issue in this case is the meaning and scope of application of the so-called "typical evidence" rule. The plaintiffs' contention is that the rule requires evidence of typical individual shipments actually made. The defendants' contention is that this kind of detailed demonstration is not required; that the rule has been (or ought to be) liberalized to allow the Commission to prescribe just and equitable divisions of joint rates on the basis of aggregate or average data.

Plaintiffs rely on the Orient case, United States v. Abilene & So. Ry. Co., 265 U. S. 274, 44 S.Ct. 565, 68 L.Ed. 1016 (1924), for their formulation of the rule. Defendants contend that the rule is more properly stated in the New England Divisions case, Akron, C. & Y. Ry. Co. v.

United States, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605 (1923), and cite that case for the proposition that the Commission could lawfully specify divisions of joint rates as between groups of railroads on the basis of evidence which the Commission deems to be typical of traffic and operating conditions, generally, on a group or average basis. As the brief for the defendant midwestern railroads puts it:

"Examination of the three-judge District Court's opinion (pp. 308–9), indicates that the Commission had before it *evidence* which was *general in nature* and *dealt with the divisions* as between the New England lines and their connections *on a group or average basis*." [Emphasis supplied] Brief, p. 11.

█ The plaintiff transcontinental western railroads strongly, and rightly, dispute that this is a proper description of the evidence which the Commission had before it for consideration in the New England Divisions case. They point out that the Commission report in New England Divisions, 66 I.C.C. 196, 201 (1920), expressly pointed to evidence showing several thousand particular rates and divisions, established on the record to constitute an "illustrative and fair" selection of representative rates and divisions. It goes without saying that the Commission was not obligated to consider every last rate and division of every carrier; but it was obliged to do something more than consider the aggregate impact on the groups of railroads of a given formula for dividing joint rates as between the groups.

█ The Supreme Court in New England Divisions set forth the requirements of the typical evidence rule as they apply in a case—such as the instant one—involving realignment of a divisions schedule as between groups of railroads:

"It is asserted [by the eastern railroads who were required by the Commission's order to accord to the New England railroads as a group a larger share of the returns from shipments subject to joint rates]

that the order is necessarily based upon the *theory that,* under § 15(6), *the Commission has authority to fix divisions as between groups of carriers without considering the carriers individually;* that Congress did not confer such authority; and that, hence, the order is void. Whether Congress did confer that authority we have no occasion to consider; for *it is clear that the Commission did not base its order upon any such theory. The order* directs a 15 per cent. increase in the divisions to the several New England lines. It is comprehensive. But it *is based upon evidence* which the Commission assumed was typical in character, and *ample* in quantity, *to justify the finding made in respect to each division of each rate of every carrier.*" [Emphasis supplied] 261 U.S. at 196, 197, 43 S.Ct. at 275, 276, 67 L.Ed. 605.

Whether the evidence before the Commission, then, consists of a specification of each division of each rate of every carrier (a practical impossibility), or whether it merely consists of evidence, typical in character, and ample in quantity to justify the conclusion that the rates and divisions actually examined are fairly representative of each division of each rate of every carrier is not determinative. The Commission is merely required to have before it, and to consider, and to some extent to rely on representative evidence relating to particular rates and divisions of particular carriers; but, even when the evidence is based merely on a representative sample of all relevant traffic moving during a certain period, it must relate to particular rates and divisions of particular carriers. Obviously, evidence which is based on all traffic moving during a certain period must also relate to particular rates and divisions of particular carriers.

■ The requirement of the rule is manifestly not met when the Commission relies wholly on evidence which relates to the aggregate impact of the divisions schedule on the groups of railroads as groups. To examine only the aggregate impact of the existing or proposed divisions schedule on the group of railroads cognizable as Western Trunk Line carriers is wholly to ignore the different effects which the adoption or retention of any particular formula for dividing joint rates may have on the long-haul transcontinental western railroads and the short-haul midwestern railroads within that aggregate group.

■ The "typical evidence" rule in divisions cases, however, does not have to do with individual shipments made by particular carriers, as plaintiffs contend; rather, it has to do with particular divisions of particular rates among particular carriers. Evidence showing the volume and type of traffic moving subject to the representative rates, although highly probative, and probably otherwise essential to a just and equitable decision, is not absolutely required by the "typical evidence" rule.

Contrary to defendants' contention, it seems clear that exactly the same rule was established in the New England Divisions case as was followed in the Orient case. Indeed, the Orient opinion and the New England Divisions opinion were both written by Mr. Justice Brandeis. The Court made it clear in the Orient case that the true significance of the rule, in the context in which it arises in the instant case, is not that representative evidence is sufficient—it is undisputed that evidence fairly representative of all rates and divisions involved is very definitely sufficient. The point is, rather, that evidence relating only to aggregates (irrespective of whether that evidence be based on all traffic moving during a certain period, or merely on a representative sample of all traffic moving during that same period) conceals the effect which the imposition of a divisions schedule may have on the constituent parts which make up the aggregate. As the Court said:

"A further objection of the carriers should be considered. They point out that the record does not

contain any tariffs showing the individual joint rates, or any division sheets showing how these individual joint rates are divided, nor any information concerning the amount of service performed by the Orient and its several connections under such individual joint rates. As justification for this omission, *it is argued* that there are in the record exhibits, furnished by the several carriers, containing data from which the Commission could reach a conclusion as to whether or not the divisions, taken as a whole, were equitable as between the Orient and its several connections; *that in a general rate case, evidence 'deemed typical of the whole rate structure' will support a finding as to each rate in the structure* by raising a rebuttable presumption concerning each rate; *that typical 'evidence' in this sense means*, not evidence directly representative of every individual rate, but *evidence tending to show, the general situation*; that a like presumption arises in a division case; *that the data dealing with the traffic in the aggregate,* which was furnished by the exhibits, *constituted such typical evidence; that*, in this proceeding, *information concerning individual rates and divisions was not essential*; and that the course pursued by the examiner [who relied on data dealing with the traffic in the aggregate] is, in substance, that upheld in the New England Divisions Case, 261 U.S. 184, 196–199 [43 S.Ct. 270, 67 L.Ed. 605].

"*The argument is not sound. The power conferred by Congress on the Commission is that of determining, in respect to each joint rate, what divisions will be just*. Evidence of individual rates or divisions, said to be typical of all, affords a basis for a finding as to any one. But averages are apt to be misleading. *It cannot be inferred that every existing division of every joint rate is unjust as between particular carriers, because the aggregate result of the movement of the traffic on joint rates appears to be unjust.* These *aggregate results should* properly *be taken into consideration by the Commission; but it was not proper to accept them as a substitute for typical evidence as to the individual joint rates and divisions.* In the New England Divisions Case, tariffs and division sheets were introduced which, in the opinion of the Commission were typical in character, and ample in quantity, to justify the findings made in respect to each division of each rate of every carrier. A like course should have been pursued in the proceeding under review." [Emphasis supplied] 265 U.S. at 290, 291, 44 S.Ct. at 570, 68 L.Ed. 1016.

Viewed in context then, it is clear that the opinions in the New England Divisions case and the Orient case both state the same rule and that that rule has general applicability. This rule has consistently required:

1. Information concerning individual joint rates; and

2. Information concerning divisions of those rates.

It does not appear, however, that information concerning the volume of traffic moving subject to particular individual rates has consistently been required. From all that appears from the published reports and decisions cited by the parties it would seem that the evidence before the Commission in the New England Divisions case which sufficed to meet the requirements of the typical evidence rule consisted of: 1) tariffs showing individual joint rates, and 2) division sheets showing how those joint rates were divided between connecting carriers. Evidence of typical actual individual shipments was apparently not required.

From the Supreme Court opinions it is, therefore, to be concluded that evidence showing the aggregate impact of a divisions schedule on a group of

railroads as a group can be accorded some weight—but that it is fatally defective to accept such evidence of aggregate impact of a divisions formula on a group of railroads, as a group, as a substitute for evidence representative of particular rates and divisions which could justify the prescription of each division of each rate of every carrier. "Typical" does not mean: tending to show the general situation; it means, rather: fairly representative of each division of each rate of every carrier. Here, as in Orient, the Commission gave disproportionate weight to the aggregate consequence and what to the Commission was an apparent injustice in the aggregate.

In the subsequent Brimstone case, Brimstone R. & Canal Co. v. United States, 276 U.S. 104, 115–116, 48 S.Ct. 282, 72 L.Ed. 487 (1928), the typical evidence rule of New England Divisions and Orient was affirmed and applied to invalidate a Commission order. In so doing the Court quoted the major part of the language from those decisions which is quoted above.

Does the Beaumont case, Beaumont, S. L. & W. Ry. Co. v. United States, 36 F. 2d 789 (D.C.Mo.1929), affirmed 282 U.S. 74, 51 S.Ct. 1, 75 L.Ed. 221 (1930), as defendants contend, state a different rule? We conclude that it does not. The lower court's opinion showed an intent to follow the typical evidence rule of the New England Divisions, Orient, and Brimstone cases when it said:

" * * * We are warranted in assuming that *the order* in this case *is based upon evidence* which the Commission assumed was typical in character and *ample* in quantity *to justify the finding made as to each division of each rate of every carrier.* It is well established that *individual rates or divisions,* which are *typical of all,* afford a proper basis for a finding as to any one. The record in this case shows every essential mentioned by the Supreme Court in the New England Divisions Case, * * Orient Divisions Case, * * * and Brimstone Divisions Case * * *.

"*All of the tariffs in effect at the time of the hearing* were *stipulated into the record* before the Commission. The *division sheets put in evidence the application of the divisions* contained in these sheets *to the rates carried in the tariffs,* as made in the case of individual shippers, were shown in detail, and evidence of this character was offered by both the representatives of the western trunk lines and representatives of the southwestern lines.

\* \* \* \* \* \*

"*The record is replete with statistical information* and *statements showing rates and divisions* applicable to individual commodities shipped in volume between the two territories. Much of this evidence is reflected in Exhibit I filed in this court by petitioners. Of the 289 exhibits offered in evidence before the Commission, great numbers of them reflect the very details mentioned in the decisions relied upon by petitioners.

"We think it clear that the Commission assumed that the record was ample in quantity and substantially typical to justify the order entered as to each of the carriers, and, as before noted, the case would seem to be ruled by the New England Divisions Case * * *." [Emphasis supplied] 36 F.2d at 796–797.

The Supreme Court expressly agreed with this appraisal of the evidence of record before the Commission.

"The *evidence* before the Commission is sufficient to disclose as to each carrier all the facts specified in § 15(6) and to furnish an adequate and reasonable basis for the proper division of each of the joint rates applicable to the traffic here involved." [Emphasis supplied] 282 U.S. at 83, 51 S.Ct. at 4–5, 75 L.Ed. 221.

■ The requirement that evidence bearing on the justification of each division of each rate of every carrier be be-

fore the Commission for its consideration is a rule dealing with the adequacy of the information which the Commission is obliged to consider before issuing its order. Whatever reasons are given in the report as the articulated basis for the order is a different and separate matter. In Beaumont the lower court specifically noted that the record was adequate in that it contained the representative *evidence* bearing on each division of each rate of every carrier as required by the typical evidence rule. The *order* which the Commission issued in Beaumont dealt with divisions on a group basis; but the fact that the ultimate *order* in Beaumont dealt with divisions on a group basis and showed reliance upon evidence showing average conditions, does not bear at all on the adequacy of the evidence representative of particular divisions of particular rates which must appear to have been considered by the Commission. It will be recalled that Mr. Justice Brandeis' opinion in the Orient case—which most strongly condemned a record lacking evidence of particular rates—indicated just as clearly that, once the typical evidence requirement had been met, the Commission could use evidence of aggregate or average impact of a divisions schedule on a group of railroads as a group as a basis for its order. Far from precluding Commission consideration and use of average data, the opinion in the Orient case states that "aggregate results should properly be taken into consideration by the Commission." The point of the Orient case is that the Commission may not rely wholly and exclusively on average or aggregate data. Before it relies on average or aggregate data, the Commission must make sure that the divisions formula under consideration (although seemingly just and equitable when viewed in terms of its impact on a group of railroads as a group) has not been constructed in such a way that its impact on any particular division of any particular rate as applied to any particular carrier is unjust. This the Commission must do by considering evidence fairly representative of each division of each rate of every carrier in

order that some inequity which might remain undisclosed by average or aggregate data is not permitted to slip in unnoticed.

The Beaumont case, then, does not deviate from the typical evidence rule of New England Divisions and Orient. In Beaumont the Commission did only what the Orient opinion held was proper; viz., rely on average data in formulating its order after it had checked the average data against data fairly representative of each division of each rate of every carrier. A careful analysis of the Supreme Court's opinion in Beaumont shows that that tribunal also understood the typical *evidence* rule of New England Divisions and Orient to be the requirement which the Commission had to meet—and did meet. The order and report of the Commission, to the extent that they spelled out the reasoning which underlay the order, did, to be sure, deal with the contesting groups of railroads on a group basis—but it was abundantly clear that the *evidence* which the Commission had before it, and which it was presumed to have considered, did bear on the just division of each rate of every carrier. This is apparent from the language of the opinion:

"The appellants contend that the Act requires the Commission to determine the divisions of each carrier upon a consideration of its own rights and needs, and does not authorize the Commission to base its *order* upon group conditions or upon average conditions in the group.

\* \* \* \* \* \*

"*The Commission* by § 15(6) *is required to consider the condition of each carrier and to determine* whether the *division of each joint rate* is unreasonable or otherwise repugnant to the specified standards and what division will for the future be just, reasonable, and equitable. United States v. Abilene & So. Ry. Co., 265 U.S. 274, 291 [44 S.Ct. 565, 68 L.Ed. 1016]. *The Commission may not change an existing division unless it finds that division unjust*

or unreasonable. Brimstone R. R. [& Canal] Co. v. United States, 276 U.S. 104, 115 [48 S.Ct. 282, 72 L.Ed. 487]. Cf. Interstate Commerce Commission v. Louisville & Nashville R. R., 227 U.S. 88, 92 [33 S.Ct. 185, 57 L.Ed. 431]. But it need not under all circumstances take specific evidence as to each rate of every carrier. When considering divisions of numerous joint rates applicable to traffic passing through gateways between different territories, the Commission may make the required determinations and establish the bases for divisions between groups of carriers in the respective territories upon evidence which it reasonably may deem typical and to have sufficient probative weight to *justify the necessary findings and the order in respect of each rate.* That is to say, such typical evidence may sufficiently disclose the facts necessary to enable the Commission duly to *consider the divisions of each joint rate to be received by every carrier.* New England Divisions Case, * * * Brimstone R. R. [& Canal] Co. v. United States * *.

"*The evidence before the Commission is sufficient to disclose as to each carrier all the facts specified in § 15(6) and to furnish an adequate* and reasonable *basis for the proper division of each of the joint rates* applicable to the traffic here involved. *The mere fact that carriers and divisions were dealt with on an average or group basis does not indicate that the Commission did not properly consider each carrier and rate * * *.*

"Appellants assert that the order is based solely upon a comparison of average conditions of widely dissimilar carriers comprising each group * * *. They show by the record that in each group there are carriers that earn little or no return, others that earn substantial amounts and some that make relatively high returns. * * *

" '*Average*' *as used in the report* manifestly is not intended to refer to an arithmetical calculation, the quotient of a sum divided by the number of its terms. It is rather to be understood as an estimated *general mean of the conditions* of the several carriers constituting each group arrived at by the exercise of judgment upon the facts shown by the evidence. *The reports satisfactorily show that* the *findings as to average group conditions* taken as a whole *are sustained by substantial and persuasive* evidence. *But they do not deal with the important question whether,* under the evidence and having regard to the wide dissimilarities between rates of return earned by individual carriers in each territory, *the use of the average or group basis is justified and whether it will produce unreasonable divisions * * *.*

"The Commission's failure specifically to report the facts and give the reasons on which it concluded that under the circumstances the use of the average or group basis is justified leaves the parties in doubt as to a matter essential to the case, and imposes unnecessary work upon the courts called upon to consider the validity of the order. Complete statements by the Commission showing the grounds upon which its determinations rest are quite as necessary as are opinions of lower courts setting forth the reasons on which they base their decisions in cases analogous to this. * * * And the Commission is not excused by the fact that the carriers presented evidence on a group basis or by the omission of the southwestern lines in their petition for a rehearing to object to the use of averages. * * *

"With this criticism of the [Commission's] reports, we turn to what is shown by the record. * * * [N]otwithstanding the wide differences in rates of return between carriers the basis adopted will not, at

least on that account, result in unjust and unreasonable divisions. The Commission must consider the financial condition of the carriers, but it is not required to make that the only test. And it did not take the average of the rates of return as the sole or principal factor for making the divisions. *As to each car-rier, operating and other conditions were shown and presumably considered by the Commission in deciding whether average or group conditions might appropriately be used."* [Emphasis supplied] 282 U.S. at 81-87, 51 S.Ct. at 3-6, 75 L.Ed. 221.

The "average" data relied on by the Commission in the preparation of its order and report in the Beaumont case, it must be noted, was not a numerical average obtained from aggregated data. Furthermore, regardless of what data was cited in the Commission's report, the Court makes it clear that the typical evidence rule still requires that the Commission have had before it representative evidence relating to the reasonableness of each existing division of each rate of every carrier. Such evidence must have been available for the Commission to consider—and it would be presumed that the Commission had properly considered it. If such representative evidence had been totally lacking, it is obvious, the Commission could not have considered it—and the Commission would consequently have failed to conform to the requirement which the typical evidence rule imposes.

In the Boston & Maine case (Boston & Maine R. R. v. United States, 208 F.Supp. 661 (D.C.Mass.1962) ), on which the defendants further rely for the proposition that the typical evidence rule no longer has vitality, the Supreme Court wrote no opinion. The judgment was affirmed *per curiam,* 371 U.S. 26, 83 S.Ct. 117, 9 L. Ed.2d 95 (1962). It seems clear in that case, too, that there was evidence of record which set forth in adequate detail the rates and divisions involved; that the typical evidence test of New England Divisions, Orient, Brimstone and Beau-

mont was applied, and that the requirements of the typical evidence rule were deemed to be met.

The defendants' suggestion that the requirements imposed by the typical evidence rule no longer obtain is unwarranted. It is said that the decision of the Supreme Court in the case of Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209 (1936) has vitiated the requirement that evidence representative of particular divisions of particular rates of particular carriers must be considered by the Commission in a divisions case. Such a contention is without merit. The consistent rule in New England Divisions, Orient, Brimstone and Beaumont has not been overruled, *sub silentio* or otherwise.

■ The consistent requirement sanctioned by the divisions cases considered above, in which the Supreme Court has written opinions, is that evidence showing specific rates and specific divisions of specific carriers be considered by the Commission and be in evidence in the controversy. That the Commission here has failed to comprehend the scope and extent of its duty in the instant case can be seen from the language of its report. Apparently recognizing that some evidence relating to specific divisions must be of record, the Commission attempted to satisfy that requirement with a passing reference to its report in Docket No. 28277, stating:

"In passing upon divisions it is of course necessary that we be informed of the nature of the divisions in issue. Ample information of that kind is to be found in our report in docket No. 28277, and it is available to us here. There was no necessity for burdening this record with a detailed exposition of the 500–A basis." 316 I.C.C. at 358

The Commission thus asks a reviewing court to assume:

*First,* that the Commission has, by thus casting a glance at material compiled before 1948, properly considered evidence representative of particular

rates and divisions currently applied; and *secondly*, that there is in the 28277 docket (which is not before the reviewing court) ample evidence representative of each division of each rate of every carrier which is a party plaintiff in this case.

In view of the fact that the proceedings in Docket No. 28277 dealt with the divisions of joint rates between a very few midwestern carriers and the eastern carriers in 1948, it strains credulity to ask a reviewing court to accept the assertion that there is contained in the material in that docket data fairly representative of the current divisions of joint rates which are in issue in the instant case between the transcontinental western carriers and the eastern carriers. We are not told that the docket in No. 28277 contains any information specifying the particular rates of the carriers which are here parties plaintiff; and we are not told that the Commission considered such information in arriving at a decision in the instant case.

The Commission's erroneous interpretation of the requirement which the typical evidence rule imposes, however, is even more gross, for it not only has failed to provide a reviewing court with any basis for determining just what evidence of particular rates it considered— it asserts that it need not consider any specific rates in a divisions case. In its report the Commission declared:

"The instant case is the final phase of litigation between official-territory railroads and the western trunklines which grew out of the establishment of joint interterritorial class rate many years ago, and the class rates historically are of basic importance. *No evidence showing those or any other specific rates is necessary.* In a divisions case more recent than the Orient case, Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 356 [56 S.Ct. 797, 80 L.Ed. 1209] (1936), the Supreme Court said:

"In proceedings to determine and prescribe divisions the commission is * * * not required or authorized to investigate or determine whether the joint rates are reasonable or confiscatory. The question whether it complied with the requirements of the Act does not depend upon the level of the rates or the amounts of revenue to be divided. The purpose of the provisions just cited [Section 15(6)] is to empower and require the commission to make divisions that colloquially may be said to be fair.

"The evidence here relating to volume of movement via various gateways, distances in the respective territories, and other details is similar to that usually introduced in cases of this kind and is adequate for the purpose." [Emphasis supplied] 316 I.C.C. at 358.

The Commission thus believed that the B & O case has laid down the rule that no rates need be in evidence notwithstanding that this is a proceeding the very purpose and function of which is to establish the just and equitable division of particular joint rates. Such a viewpoint is palpably erroneous. No divisions case has even suggested that such is the rule. Reliance on the quoted language from the B & O decision is singularly inapposite—for the B & O case was one in which the issue before the Supreme Court was whether or not the divisions and rates established by the Commission were confiscatory. In the proceeding before the Commission, however, there was no issue with respect to whether or not the level of the rates established was confiscatory. As the Supreme Court's opinion stated, in context:

"* * * The division of presumably reasonable rates was the only problem before the commission. Neither complaint alleged that existing divisions were not more than sufficient to cover the out-of-pocket costs or that they were confiscatory.

"The commission was required to decide whether, in respect of the joint rates, the carriers had dis-

charged the duties imposed upon them by § 1(4), i. e., 'to establish just, reasonable and equitable divisions thereof as between the carriers * * * participating therein which shall not unduly prefer or prejudice any of such participating carriers.' The prescribing of divisions is a legislative function. Exertion of that power by the commission is conditioned upon its finding after a full hearing that the divisions then in force do not, or in the future will not, comply with the specified standards. In proceedings to determine and prescribe divisions the commission is governed by § 1(4), 15(6), 15a(2); it is not required or authorized to investigate or determine whether the joint rates are reasonable or confiscatory. The question whether it complied with the requirements of the Act does not depend upon the level of the rates or the amount of revenue to be divided. The purpose of the provisions just cited is to empower and require the commission to make divisions that colloquially may be said to be fair." 298 U.S. 356–357, 56 S.Ct. 802, 80 L.Ed. 1209.

When the quotation given by the Commission from the B & O opinion is viewed in context, then, it is seen to mean only that it is not the Commission's function to determine whether the overall level of rates is confiscatory in violation of the Fifth Amendment. It is, rather, the Commission's function to examine the divisions of rates which currently obtain (assuming them to be non-confiscatory) and determine, from an examination of the particular divisions of the particular rates in question between particular carriers, whether the division is, in the broadest sense, "fair." B & O, whatever else it stands for, certainly does not stand for the proposition that the Commission, in prescribing divisions of joint rates, need not take notice of what those rates are.

In the instant case the Commission must make two separate determinations, and it must make both of them on the basis of evidence which is adequate to sustain the finding made. It must, moreover, articulate a rational connection between the finding made and the evidence on which the finding is based. Those two separate determinations are:

1. That the existing 500–A divisions schedule is unlawful because unreasonable and unjust;

2. That the 28277 divisions schedule which it proposes to place in the stead of the 500–A divisions schedule is lawful because reasonable and just.

It is the first of these necessary determinations upon which we have thus far focused, for no new divisions schedule can be prescribed unless or until the existing schedule is found to be unlawful on the basis of representative evidence shown to have been considered by the Commission. The record here for review is devoid of substantial evidence which would show a reviewing court that divisions of rates applicable to the plaintiffs under the 500–A schedule were unlawful. Moreover, there is no substantial showing that the Commission had considered evidence of any specific rates and divisions. It is, as before noted, asserted that data respecting the particular rates applicable to carriers who are here parties plaintiff was available to the Commission in another docket, No. 28277. That proceeding, however, dealt with divisions of revenue arising from traffic interchanged with eastern carriers which originated or terminated on only six midwestern lines. The data there presented was prewar data. Why we should assume that the data available to the Commission in Docket No. 28277 has any great bearing on the present divisions of particular rates applicable to the transcontinental western lines who are here parties plaintiff is not obvious. We do not know what evidence was available in Docket No. 28277. It is not before us here! A reviewing court cannot determine whether the data alluded to is not outdated,

whether it is representative, whether it is substantial, or, indeed, whether it applies to the plaintiffs at all. Neither can we determine whether the Commission considered that evidence. There is no statement by the Commission in its report that it did consider that evidence. To the contrary, there is a statement, a wholly erroneous conclusion of law, that it was not obliged to consider any evidence showing specific rates. In light of the absence of the one statement and the presence of the other, we are not warranted in assuming that the Commission did consider such evidence. We note, of course, that it would not constitute error, in and of itself, to incorporate evidence from another docket, United States v. Pierce Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946). This practice, however, could in certain circumstances create unjustified prejudice.

■ There is, then, a failure on the part of the Commission to show in its report that it even considered evidence fairly representative of the specific divisions of specific joint rates which were here declared unlawful. In the aggregate the impact of the 500–A schedule may indeed be unjust, but the Commission has not made the required comparison of aggregate traffic evidence leading to that conclusion with evidence representative of particular divisions of particular rates which would warrant our endorsement of the action which the Commission has taken in declaring the 500–A schedule unlawful.

B. *The legality of the Commission's prescription of the 28277 Schedule*

Entirely separate from the issues involved in the Commission's finding that the existing 500–A divisions schedule was unjust the question arises whether the Commission's prescription of a new divisions schedule to be applied to eastern-transcontinental traffic was lawful. It was the Commission's intention to impose an "equal factor" scale to replace the 500–A scale, which involved "inflation" of the divisions allotted to the plaintiff transcontinental western lines.

The Commission's order prescribed a divisions schedule which is referred to as the "28277 scale," being the same as the scale which was prescribed in I.C.C. Docket 28277 and 28589, Official-Western Trunk Line Divisions, 269 I.C.C. 765, 788. That proceeding, instituted in 1939 by six midwestern lines which did not agree to the 500–A basis, was decided in 1948. The Commission found that the 500–A basis favored the eastern carriers who, in comparison with the six midwestern carriers, were long-haul carriers, and a new basis of divisions was prescribed, limited to the traffic interchanged between the eastern lines and the six complainant midwestern lines. The Commission was "in doubt whether the issues presented by the two complaints are broad enough to support a comprehensive revision of divisions between the eastern lines and all western trunk lines involving reductions as well as increases in the present [500–A] divisions * * *". Subsequent to the filing of the present complaint, but before the complaint was heard by the Commission, several midwestern and western carriers entered into negotiations with the eastern carriers to voluntarily fix divisions, and these negotiations resulted in the agreement of October 4, 1955 between the eastern carriers and several midwestern carriers, which in effect extended the 28277 basis to the signing parties and any other parties who might thereafter decide to join. Thus at the time the instant case was decided, the 28277 basis was applicable to traffic interchanged between the defendant eastern lines, who operate in Official territory, and the defendant midwestern lines, who operate generally in the eastern portion of the Western Trunk Line territory. The plaintiffs herein did not agree to the 28277 basis.

Analysis of the Commission's report does not shed a great deal of light upon the reasons why, out of all possible courses of action, it decided to prescribe the 28277 scale. Only two sections of the

report give an indication of such reasons:

"* * * The fact that the 28277 basis has continued in effect for 13 years and has been broadened in application by the agreement of October 4, 1955, seems to indicate some degree of general approval thereof." 316 I.C.C. at 364.

And:

"Uniformity would be attained by replacement of the 500–A basis by the 28277 basis. The fact that the latter basis is satisfactory to the western trunk lines which handle the greater part of this inter-territorial traffic and perform both long and short hauls, in our opinion, is a significant and important circumstance. Rates on Lumber and Other Forest Products, 31 I.C.C. 673, 676." 316 I.C.C. at 366.

The statutory command as to what the Commission is obliged to consider in divisions cases is contained in the Interstate Commerce Act, Section 15(6), 49 U.S.C. § 15(6):

"* * * In so prescribing and determining the divisions of joint rates, fares, and charges, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare, or charge."

The plaintiffs attack the prescription of the 28277 scale on three bases: 1)

that it is unlawful because it is based upon a private agreement rather than the standards of the Interstate Commerce Act; 2) that it is unsupported by any rational findings; and 3) that it is contrary to the evidence in the record.

Plaintiffs' first contention is that the Commission erred in relying upon the 1955 agreement. This, either because the Commission could not take the agreement into consideration under any circumstances, or because it could not take the agreement into consideration in the instant case.

The parties have expressed varying opinions as to how much reliance was placed by the Commission upon the 1955 agreement. The precise amount of reliance, and the semantics of describing that amount, are not material to our determination of the issue. It is impossible to conclude from the Order any fact other than that the Commission relied to a considerable extent upon the 1955 agreement, and the subsequent satisfaction of the parties thereto, in determining that the 28277 basis was a suitable basis. The difficulty in reaching any other conclusion is due in large measure to the fact that there is a lack of other reasons to support the Commission's action. It would appear that the fact that the 28277 schedule was prescribed in 1948 to control divisions on part of the Official-Western Trunk Line traffic; that subsequently other midwestern carriers voluntarily subjected themselves to the schedule; and that the divisions obtained thereby were lawful as between the participating carriers, is considered by the Commission sufficient reason to impose the 28277 schedule on the plaintiffs in the instant case, and that uniformity would be obtained thereby.

Plaintiffs' first argument, that the Commission is forbidden to consider the agreement at all, is based upon a misconception of Section 15(6). It is plain from the terms of the statute that the Commission is empowered to inquire into the justification of existing divisions of joint rates, whether those divisions were established by order of the Commission

or by agreement of the carriers. From this it is concluded by the plaintiffs that the Act also intends to preclude the Commission from taking into consideration any agreement of the carriers when prescribing new divisions, because the danger of reliance upon a collusive agreement is so great, and the difficulty in proving such reliance and collusion is so difficult that it could never be determined by the courts that the Commission fulfilled its duty of independently exercising its discretion.

As authority for this proposition, plaintiffs cite Brimstone R. & Canal Co. v. United States, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928), which considers in detail the history of Section 15(6). The Brimstone case, as well as the Act, draws a clear distinction, which plaintiffs do not here recognize, between the Commission's evaluation of existing divisional scales and its evaluation of divisional scales to be prescribed in the future. The 1920 Amendment to the Act increased the powers of the Commission by allowing it to declare agreed-upon divisions to be unjust. But the cited ruling of the Supreme Court does not, as plaintiffs maintain, hold that the Commission may not consider agreed-upon divisions when prescribing a new divisions schedule. Rather, it holds that the Commission must look, not only to the agreement and its surrounding circumstances, but also to other factors listed in the Act. Indeed, the very wording of the Act leads to the conclusion that the Commission has a duty to give consideration to a broad spectrum of factors when prescribing and determining new divisions:

"* * * [T]he Commission shall give due consideration, among other things, to * * * any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare, or charge." 49 U.S.C. § 15(6).

It would be unduly restrictive for the courts, in view of this plain statement by Congress that the Commission shall look to many facts and circumstances, to say that one fact, an agreement of the parties, may not be considered. Nor should it be for the courts to presume that the Commission is incapable of distinguishing a collusive agreement, which is against the public interest, from an agreement which is fair and just; or that the Commission is incapable of resisting the temptation to rely upon carriers' agreements. Thus the plaintiffs' argument on this facet of the issue must be rejected.

However, the question whether the Commission's substantial reliance upon the agreement was in this case proper is an issue. In support of its reliance on the agreement as a "significant and important circumstance," (316 I.C.C. at 366) the Commission felt that it was merely following its precedent in Rates on Lumber and Other Forest Products, 31 I.C.C. 673, 676. Plaintiffs point out that the key to that decision lies in the statement:

"In establishing equitable divisions, it is necessary to have regard for all the surrounding circumstances and conditions. It is therefore important to consider the conduct of other lines *in like situations*." [Emphasis supplied]

It is plain from the record of the case that the agreement of the midwestern lines voluntarily to adopt the 28277 divisions schedule was definitely not, as compared with the situation facing the transcontinental western lines, "conduct of other lines in like situations." In its opinion in Docket No. 28277 in 1948, the Commission stated:

"Since the eastern lines have a longer average haul on this interterritorial traffic than the western roads, the progression represented by the 500–A divisions definitely favors the eastern carriers. This feature of the 500–A basis is particularly disadvantageous to complainants, since they interchange a larger proportion of their shipments

at St. Louis-East St. Louis, than the western defendants, and the western lines' average haul via that gateway is relatively shorter than it is via other interchange points." 269 I.C. C. 769, 777

Plaintiffs have offered in evidence three exhibits (Nos. 26, 27 and 28) which were designed to show the effect of adoption of the 28277 schedule as respects traffic moving between the eastern and midwestern defendants, with the aim of showing that the 28277 schedule was greatly beneficial to the midwestern defendants—thus showing the motivation behind the 1955 Agreement. Although this evidence would have gone to the very heart of the issue of whether the voluntary act of the midwestern carriers in entering into the agreement was "conduct of lines in like situations," the Commission excluded the exhibits on the ground of irrelevancy. In so doing, the Commission intended to narrow the proceeding to a controversy solely between the eastern defendants and the transcontinental western lines which are now plaintiffs. The net result of this action was to exclude evidence which was not only put in issue by the original pleadings, which have not at this point been amended, but which was the type of evidence necessary to establish the basis for application of the Commission's own test for comparison. Hence, it cannot be said that this evidence was irrelevant. There is a great deal of evidence in the record to show that while defendants are primarily short haul carriers, plaintiffs are primarily long haul carriers, with respect to the traffic here involved, and that the 28277 basis not only eliminates the "inflation" which was previously enjoyed by the plaintiffs, but imposes a declining mileage factor which relatively decreases revenues with increasing distance. Of course, plaintiffs argue vigorously that they are adversely affected by the Order. The Commission concluded that the substitution of the 28277 schedule in place of the 500–A schedule yielded about seven per cent. more to the eastern railroads than they formerly received. It

seems obvious that the situation of the 1955 signatories was just the opposite of the situation facing the present plaintiffs. Apparently the midwestern signatories to the agreement primarily participate in Official-Western Trunk Line traffic as short haul carriers and stood to gain from the increased terminal allowance of the 28277 scale. Not only did the Commission exclude evidence of the type necessary to justify its reliance upon the 1955 agreement—it failed to apply the evidence which was already in the record to such a determination. The Commission's grouping of the western and midwestern roads was invalid, since no similarity of circumstances was demonstrated. In view of the fact that that evidence tends rather more to establish the fact of unlike circumstances than the fact of like circumstances, the Commission erred in finding that the agreement of October 4, 1955 was "significant and important." Cf. Boston & Maine Railroad v. United States, 208 F. Supp. 661 (D.C.Mass.1962).

If the mere fact that the 28277 schedule was agreed to by the eastern and midwestern defendants (and had applied to *some* eastern-midwestern traffic for thirteen years) cannot be significant enough to be the basis of the Commission's order, neither can the fact that the prescription of the 28277 schedule would promote uniformity, for this factor was relied upon by the Commission not for the purpose of finding a reason for prescribing the latter schedule, but for the denial of the Eastern railroads' request for the prescription of an entirely different divisions schedule. The Eastern lines had been arguing for the prescription of a schedule which would have given them fifty-six per cent. of the revenue on eastern-transcontinental traffic. The Commission's report rejected this plan:

"If the 500–A basis were to be replaced by a scheme under which the complainants [Eastern lines] would receive fifty-six per cent. of the total revenue on the traffic remaining in issue, as they request, there would

inevitably be unjustified inconsistencies with the 28277 divisions. Their traffic study indicates that substitution of the 28277 basis for the 500–A basis would give them 48.3 per cent. of the total revenue instead of fifty-six per cent, yielding about seven per cent more than the existing divisions. On the other hand, an increase of twenty-four per cent in their present revenue would be necessary in order to give them fifty-six per cent. of the total revenue.

"Uniformity would be attained by replacement of the 500–A basis by the 28277 basis. The fact that the latter basis is satisfactory to the western trunklines which handle the greater part of this interterritorial traffic and perform both long and short hauls, in our opinion, is a significant and important circumstance * * *" 316 I.C.C. 366.

It is clear from this wording that the Commission did not intend uniformity to be one of the circumstances which it was considering, in compliance with Section 15(6), in making its determination that the 28277 schedule was the one which would be just and reasonable to prescribe for eastern-transcontinental traffic. If uniformity had been intended as an important consideration, basic requirements of proper administrative procedure would have required the Commission to discuss *affirmative* virtues of having uniform divisions apply throughout Western Trunk Line territory.

The Commission is correct in insisting that there is no single test which can be applied in determining all divisions. However, Section 15(6) does provide a series of tests, and although no one of these factors is controlling, the Act requires more than lip service to be paid to each of them. Although "[e]rror as to the weight to be given financial needs, operating costs or other material facts is not a misconstruction of the Act," Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209,

(1936), and "[t]he evaluation of the importance of the various factors in any given case is peculiarly the function of the ·Commission," Boston & Maine R. Co. v. United States, supra, 208 F.Supp. at page 675, it is by no means true that the Commission may seize upon one factor and ignore the rest.

■ The Act lays down the tests of relative efficiency, public interest, terminal costs, revenue needs, and any other facts which would, without regard to the mileage haul, entitle one carrier to a greater or lesser proportion of the joint rate. Among the "other facts" which the Commission may consider is the cost of service of the participating carriers, which issue may be entirely different from the issue of revenue needs. Cf. Baltimore & Ohio R. Co. v. United States, supra, 298 U.S. page 360, 56 S.Ct. page 804, 80 L.Ed. 1209.

As to the tests of relative efficiency and public interest, the Commission said in its report:

"There is no evidence tending to prove that any of the groups of contesting parties is less efficiently operated than another. The complainants take the position that the operations of both the eastern and western groups of railroads are conducted with efficiency * * * Under these circumstances it is fair to conclude that a substantially equal degree of efficiency is maintained by the respective groups. It is also concluded that the services of the respective groups of carriers are of equal importance to the public, no question being raised as to this matter." 316 I.C.C. at 366–67.

As to relative costs of service, the Commission, in denying the eastern lines' request for a schedule which would give a 56 per cent. division to the eastern lines, said only that it would not make cost of service the primary issue and indeed, concluded: " * * * we do not find in that evidence any helpful pattern for fashioning new divisions." (316 I. C.C. at 361)

As to terminal costs, which the Act describes as "whether any particular participating carrier is an originating, intermediate, or delivering line," there is no consideration of this factor in the record, despite the fact that the parties all agree that the variation in terminal allowances between the 500–A and 28277 schedules is of strategic importance to all the carriers involved.

As to revenue needs, the Commission found:

"In the postwar years, 1947–59, the average rate of return of the carriers in the eastern district and the Pocahontas region, based on net book investment, was 3.31 per cent. For those in the western district [the midwestern defendants in the instant case] it was 3.64 per cent, and for the nine principal active defendants [plaintiffs here] it was 4.08 per cent. Based on our so-called elements of value the eastern and Pocahontas railroads had an average rate of return of 3.53 per cent in the years 1947–48, compared with 4.19 per cent for the western district and 4.66 per cent for the nine principal active defendants.

"Only in 1953, 1955, 1956 and 1957 did the official lines have a higher rate of return (based on net book investment) than those in the western district, and only in 1956 was their rate of return higher than that of the nine principal defendants. In each of the years from 1947 to 1959 the rate of return of the official lines based on elements of value was lower than that of either of the other groups * * *

"*From the best available data, it is estimated that upon a traffic volume of May 1953 prescription of the 28277 scale would increase complainants' revenue by about $3 million annually. Such a result would be consistent with the evidence pertaining to revenue requirements of the respective groups.* The increase would principally affect traffic for the shorter movements in official ter-

ritory because of essential differences between the 500–A basis, reflecting a mileage prorate, and the 28277 scale. On traffic to and from New England there would be an indicated annual reduction of $36,115.-00–0.6 per cent. The complainants [eastern defendants here] cite this fact in their criticism of the 28277 scale, ignoring the similar consequence of the 1955 agreement, of which the New England railroads were signatories. The complainants' financial statistics in evidence made no separate showing for individual eastern lines other than the Pennsylvania, New York Central, Baltimore & Ohio, and the Erie, which received nearly 60 percent of the eastern revenue in May, 1963." [Emphasis supplied]. 316 I.C.C. at 362

From the above, it is clear that the Commission considered the impact of the 28277 scale entirely from the point of view of the eastern lines. In its haste to ameliorate the declining fortunes of these lines, the Commission has addressed itself neither to the possible shortcomings of the 28277 scale nor to the impact of that scale upon the plaintiffs, despite the serious objections which the plaintiffs put forward. Cf. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). To say that the adding of three million dollars annually to the revenue of the eastern lines "would be consistent with the evidence pertaining to revenue requirements of the respective groups" gives this Court no indication as to what evidence was considered and which "respective group[s']" requirements were considered by the Commission. The Commission was concerned, again, not with seeking evidence to substantiate the reasonableness of the 28277 scale, but with evidence to deny the eastern lines' request for a scale which allotted an even greater division to the eastern lines. There is evidence in the record of the relative rates of return on investment and on "elements of

value," but whether consideration of this evidence is sufficient to justify the Commission's action it is not necessary to consider here. From the general tone of the Commission's report, it cannot be concluded that the Commission did consider substantial evidence of revenue needs of *all* the parties, either as groups or as individuals, for the report shows only a consideration of the revenue needs of the eastern lines, and even then not all of the eastern lines' needs were in evidence on an individual basis. Since the 28277 scale principally affects those lines with shorter movements in Official territory, it would not be unreasonable to require the Commission to show some evidence of the revenue needs of these lines; and some indication that the Commission considered the principal effect of the 28277 schedule on particular transcontinental lines.

▮ We are not unaware of the fact that the Commission's discretion in these matters is a broad one. However, we are concerned with the requirement that an agency's discretionary order must be upheld, if at all, on the same basis as that given by the agency.

"[A] simple but fundamental rule of administrative law * * * is * * * that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action." Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, see also Burlington Truck Lines case, supra.

The grounds here invoked by the Commission are simply that the eastern lines need additional revenue, but that the scale which the eastern lines ask the Commission to prescribe is not the proper one. The Administrative Procedure Act, Section 8(b), 5 U.S.C. § 1007(b),

requires more than that. All decisions shall "include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record." The Supreme Court has recently emphasized that this section is intended to have teeth. In the Burlington Truck Lines case, supra, at 371 U.S. 167, 83 S.Ct. 245, 9 L.Ed.2d 207, the Court said: [omitting citations]

"There are no findings and no analysis here to justify *the choice made*, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedure Act will not permit us to accept such adjudicatory practice. * * * Expert discretion is the life blood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' * * * 'Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body.' * * * The Commission must exercise its discretion under § 207(a) [Interstate Commerce Act] within the bounds expressed by the standard of 'public convenience and necessity.' * * * And for the courts to determine whether the agency has done so, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it. * * * *'" 371 U.S. 167, 168, 83 S.Ct. 245, 246, 9 L.Ed.2d 207.

It is argued by the defendants that in the Burlington case the Commission was concerned with "the choice between two vastly different remedies with vastly different consequences to the carriers and the public," and that the strict requirement of findings and reasons does not apply in the instant case, where the choice is among a variety of divisional scales.

We think that the requirement should not be relaxed here, for the necessity for us to determine whether the Commission exercised its discretion within the bounds of "due consideration" to efficiency, revenue needs, public interest, and any other facts entitling one carrier to a greater or less proportion of a joint rate, is as great under Section 15(6) as it is to determine the bounds of "public convenience and necessity" under Section 207(a).

■ However, even if the Commission had presented findings and analyses of the relative revenue needs of the specific participating carriers and had based those findings and analyses on substantial evidence, the order would still be deficient for failure to recognize, as required by both the Act and the Supreme Court as far back as the Orient case, that the Commission must consider *all* of the standards enumerated by Section 15(6). Here the Commission failed to consider terminal costs, assumed the equality of efficiency and public interest, found relative costs of service "unhelpful," and made no finding based upon revenue needs which would justify the action taken. Thus we can only reach the conclusion that the 28277 scale was unlawfully prescribed.

In summary, we find that the Commission improperly found the pre-existing 500–A divisions scale to be unlawful; this, because requirements of the typical evidence rule were not met.

We further find that the Commission improperly prescribed the 28277 divisions scale for eastern-transcontinental inter-territorial traffic. The latter because of the Commission's failure to observe the standards of Section 15(6) of the Interstate Commerce Act and Section 8(b) of the Administrative Procedure Act.

The Commission order is set aside and the cause is remanded to the Commission for further proceedings consistent with the views expressed herein.

Dated at Denver, Colorado, this sixteenth day of January, A. D. 1964.