**ABERDEEN AND ROCKFISH RAILROAD COMPANY et al., Plaintiffs,**

**v.**

**The UNITED STATES of America**

**and**

**the Interstate Commerce Commission, Defendants.**

**No. 15454.**

United States District Court
E. D. Louisiana,
New Orleans Division.

June 30, 1967.

Donald F. Turner, Asst. Atty. Gen., Louis C. LaCour, U. S. Atty., John H. D. Wigger, Atty., Dept. of Justice, for the United States.

Robert W. Ginnane, Gen. Counsel, Arthur J. Cerra, Associate Gen. Counsel, Betty Jo Christian, Atty., I. C. C., for Interstate Commerce Commission.

Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., Sidley, Austin, Burgess & Smith, Washington, D. C., for plaintiff Southern Railroads.

Walter R. McDonald, Hurt, Hill & Richardson, Joseph H. Kavanaugh, Baton

Rouge, La., for intervening plaintiff railroads.

Montgomery, Barnett, Brown & Read, New Orleans, La., Kemper A. Dobbins, Cleveland, Ohio, Joseph F. Eshelman, Philadelphia, Pa., Eugene E. Hunt, New Haven, Conn., Edward A. Kaier, Philadelphia, Pa., Kenneth H. Lundmark, New York City, Charles C. Rettberg, Jr., Baltimore, Md., for intervening defendant railroads.

Before WISDOM, Circuit Judge, and HUNTER and WEST, District Judges.

EDWIN F. HUNTER, Jr., District Judge:

This is an action to set aside and enjoin in part the order of the Interstate Commerce Commission (Commission) in Docket No. 29885,[1] Official-Southern Divisions, 325 I.C.C. 1 and 325 I.C.C. 449, which prescribed divisions of joint-rail rates on freight traffic moving between Official and Southern territories.[2]

Freight traffic between the North and the South moves on joint rates which are established when two or more carriers publish a single charge to be paid by the shipper for carriage from the originating point on one line to a destination on another. The proportion of the joint rates which each line receives as its share is called a "division" which is normally determined by agreement among the participating carriers. Prior to the orders of the Commission in this proceeding, the primary divisions accruing from Official-Southern traffic were made under an equal-factor scale prescribed by the Commission itself in its 1953 decision in Docket No. 29885 (officially reported at 287 I.C.C. 497). This decision followed the landmark decision of the Commission in Class Rates Investigation, 1939, 262 I.C.C. 447 (1945), wherein the Commission found that the higher rate level which was at that time applicable to the movement of rail freight in Southern territory, constituted an unlawful discrimination against the South.[3] In the *Class Rates* proceeding, the Commission ordered the discriminatory class rates structure eliminated and replaced with a uniform rate structure to be applicable throughout the United States east of the Rocky Mountains. In the *Divisions* case that immediately followed the order removing the territorial differences in class rates, the Commission ordered that, in line with the new uniform class rates, a uniform divisional scale be used by both Northern and Southern railroads in dividing revenues from North-South traffic. Official-Southern Divisions, 287 I.C.C. 497, 523, 546–547 (1953).[4]

1. Also embracing No. 29799, Akron, Canton & Youngstown R.R. Co., et al. v. Aberdeen & Rockfish R.R. Co., et al.

2. Official territory lies generally east of the Mississippi River and north of the Ohio River and certain points in Virginia. Southern territory lies generally east of the Mississippi River and south of Official territory.

3. The Supreme Court sustained this action in State of New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947). The uniform rates prescribed by the Commission became effective in 1952. Class Rates Investigation, 1939, 281 I.C.C. 213 (1951).

4. "Divisional scales," are the form in which the Commission has consistently prescribed divisions of North-South revenues. Divisional scales are simply tools for determining percentage divisions by a most elementary use of the common fraction. The use of the uniform divisional scale prescribed by the Commission in 1953 may be illustrated for a shipment moving 200 miles in the North and 400 miles in the South. The Northern factor on such shipment under the uniform scale is 101; the Southern factor is 149. Accordingly, the Northern division would be 40.4% (101 divided by 250, or 101 plus 149); the Southern division would be 59.6% (149 divided by 250). Where the 400-mile haul is in the North and the 200-mile haul is in the South, the Northern division is 59.6% and the Southern Division is 40.4%. For shipments moving equal distances in the two territories, the equal-factor scale yields equal divisions, as can be shown by an example of a shipment moving 300 miles in the North and 300 miles in the

In 1956, the Northern railroads, dissatisfied with this equal-factor basis of dividing joint rates, called upon the Commission's statutory authority to determine that the joint rate divisions "are or will be unjust, unreasonable, inequitable or unduly preferential" and to prescribe "just, reasonable and equitable divisions" in their place. (49 U.S.C.A. § 15(6).

Upon completion of the hearings, issuance of an Examiners' Report, exceptions and replies thereto, and after hearing oral argument, the Commission issued its 1965 report and order finding that the existing divisions were in violation of Section 15(6). Considering each of the Section 15(6) criteria, the Commission found that both groups of carriers were being operated efficiently and that neither group should be considered as more or less efficient than the other (325 I.C.C. at 18), that there were no differences in importance to the public attributable to the two railroad groups (325 I.C.C. at 28), that neither group had greater revenue needs than the other (325 I.C.C. at 49), but that there is a decisive difference in the relative costs of rendering the service as between the groups of carriers. (325 I.C.C. at 50).

Finding everything else to be substantially equal and that an adjustment in the existing divisions was required to compensate the respective carriers according to their expenditures in the joint effort of handling the traffic, the Commission concluded that the relative costs of the parties can properly serve as a guide for the determination of just, reasonable, and equitable divisions for the future (325 I.C.C. at 50).

The order prescribed a new divisional formula which gives the Northern railroads 45% more than the Southern railroads for each terminal service performed and 10% more than the Southern railroads for each mile of line-haul service performed. The Commission went on to construct new scales which reflected the principles affecting long versus short hauls and then prescribed a scale of divisional factors based on fully distributed costs which divide the revenue in proportion to those costs (325 I.C.C. at 50–51). The net effect of the Commission's action was to reduce the revenue of the Southern railroads by $8,838,000.[5]

The action in this Court was originally brought by forty-two (42) railroads which together make up virtually the entire rail system in the States of Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina and Tennessee. The Southern Governors' Conference and the Southeastern Association of Railroad and Utilities Commissioners filed an intervening complaint asking that the Commission's action be set aside in part. Forty-eight (48) railroads serving primarily Northern areas intervened in defense of the Commission's order.

It should be noted that plaintiffs do not seek to set aside the order in its entirety. Their argument is that the Commission determined two precise issues which are severable, namely: (1) whether the Northern lines were entitled to an increase in their divisions because of higher costs than the Southern lines, and (2) whether the old scale of divisional factors was invalid because of an excessive terminal element of 37 integers in the initial mileage block. The effect

South. The factor prescribed for a 300-mile haul is the same in each territory (125) (287 I.C.C. at 552, Col. 1). As a result, the percentage division for the North is 50% (125 divided by 250) and for the South is also 50%. Thus, under the uniform scale prescribed in 1953, Northern and Southern railroads each received the same compensation from joint revenues for performing the same amount of service in carrying North-South traffic in their respective territories.

5. The Commission found that the net effect of the scales which it prescribed would be to reduce the revenues of the Southern railroads by $7,948,004 (325 I.C.C. at 50). The Commission's calculation was based upon "an overall estimate" and the Commission abandoned any defense of the accuracy of that calculation in its supplemental report, taking the position that it need not find the revenue effect of its action (325 I.C.C. at 453, 454).

of the Commission's action on the two subjects (as petitioners put it) would be:

 (1) The reconstruction of the divisional scale benefited the Southern railroads by $7,426,000 annually.

 (2) The inflations accorded the Northern railroads reduced the Southern railroads by $16,264,000 annually.

 (3) The net effect of these two computations was to reduce the revenue of the Southern railroads by $8,-838,000.

Plaintiffs argue that we possess the power and should set aside as unlawful only that part of the order which prescribed increased divisions for the Northern lines. They further contend that such action would leave in force the old uniform scale, minus 37 integers which resulted from the Commission's alleged "separate action correcting the excessive terminal factors in the existing uniform divisional scale." This Court, it is true, by virtue of its authority under 28 U.S.C.A. § 2321, has the power to "set aside in whole or in part" an order of the Commission, and there are situations where provisions excised from administrative orders are separable or so minor as to make remand inappropriate. This is certainly not the case here. The Commission gave weight to the plaintiffs' initial mileage block argument only "in light of our subsequent conclusion to be guided by the relative costs in our general determination * * *." It cannot be known what the Commission would have done with respect to giving weight to that argument if it were viewed independent of the other facts which induced the Commission to prescribe the divisional bases which it did prescribe.

■ The Commission determined only one issue in two steps, (I.E.) it determined the unlawfulness of the old divisions and prescribed new divisions for the future. If the plaintiff succeeds here in permanently setting aside the Commission's order as it prescribes the new divisional scales, there would remain no severable part of the order. This is true because there is nothing whatever in the record to even suggest that the Commission found reasonable (provisionally, contingently, or otherwise) any basis of divisions other than that which plaintiffs seek to annul in this action. Accordingly, since the Commission's order is not severable and this Court lacks jurisdiction to prescribe divisions, the function of this Court ends if it finds the Commission's order prescribing divisions is contrary to law or unsupported by adequate findings or substantial evidence. F. P. C. v. Idaho Power Company, 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15 (1952); Salzberg v. United States, 176 F.Supp. 867 (S.D.N.Y.1959).

■ We proceed to a review of the Commission's findings, conclusions and the evidence. The applicable standards of judicial review are limited in scope by settled principles of Administrative law, both general [6] and statutory.[7] These standards are to be vigorously enforced.

In Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), the Supreme Court stated:

"Expert discretion is the life blood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion.' New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (dissenting opinion). 'Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body.' Federal Communications Comm'n v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470. The Commission must

---

6. See Roadway Express, Inc. v. United States, 213 F.Supp. 868, 873 nn. 18 & 19 (D.C.Del.1963), aff'd, 375 U.S. 12, 84 S.Ct. 53, 11 L.Ed.2d 38 (1963).

7. 5 U.S.C.A. § 1009(e); 5 U.S.C.A. § 1007 (b).

exercise its discretion under § 207(a) within the bounds expressed by the standard of 'public convenience and necessity.' Compare id., at 91, 73 S.Ct. 998 at 1002, 97 L.Ed. 1470. And for the courts to determine whether the agency *has* done so, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 197, 61 S.Ct. 845, 85 L.Ed. 1271. The agency must make findings that support its decision, and those findings must be supported by substantial evidence. Interstate Commerce Comm'n v. J-T Transport Co., 368 U.S. 81, 93; United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 488–489, 62 S.Ct. 722, 86 L.Ed. 971; United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023."

The statutory standards of judicial review are found in the Administrative Procedure Act, which provides, to the extent here pertinent, that the reviewing court shall:

"hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * * (5) unsupported by substantial evidence in any case * * * reviewed on the record of an agency hearing provided by statute * * *. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error." (5 U.S.C.A. § 1009(e)).

* * * * * *

"Section 8(b)—

"Prior to each recommended, initial, or tentative decision, or decision upon agency review of the decision of subordinate officers the parties shall be afforded a reasonable opportunity to submit for the consideration of the officers participating in such decisions (1) proposed findings and conclusions, or (2) exceptions to the decisions or recommended decisions of subordinate officers or to tentative agency decisions, and (3) supporting reasons for such exceptions or proposed findings or conclusions. The record shall show the ruling upon each such finding, conclusion, or exception presented. All decisions (including initial, recommended, or tentative decisions) shall become a part of the record and include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; and (2) the appropriate rule, order, sanction, relief, or denial thereof." (5 U.S.C.A. § 1007 (b)).

The statutory duty of the Commission is clear. Section 15(6) of the Interstate Commerce Act, 49 U.S.C.A. § 15(6), directs it to set aside inequitable divisions of joint rates and to prescribe equitable ones. The ICC is explicitly directed to consider relative efficiency, public interest, terminal costs, revenue needs, and any facts which would, without regard to the mileage haul, entitle one carrier to a greater or lesser proportion of the joint rate. Among the "other facts" which the Commission may consider is the cost of service of the participating carriers, which issue may be entirely different from the issue of revenue needs. Baltimore and Ohio R.R. v. United States, 298 U.S. 349 at p. 360, 56 S.Ct. 797, 80 L.Ed. 1209. Here, the divisions were prescribed solely on the basis of the relative costs of handling the specific freight traffic at issue. The Commission said:

"Everything else being substantially equal, the relative costs of the parties reflecting their respective operations as to this traffic can properly serve, as here, as a guide for the determination of just, reasonable, and equitable divisions." 325 I.C.C. at p. 50.

A fundamental rule of administrative law is that a reviewing court, in dealing with a determination of an administrative agency must judge the propriety of that action solely on the basis invoked by the agency. If this basis is inadequate the court is powerless to affirm the administrative action. S. E. C. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

The *Chenery* rule was expressly applied in the review of an order of the Interstate Commerce Commission under the Administrative Procedure Act in Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). The Supreme Court reaffirmed these rulings again in N. L. R. B. v. Metropolitan Life Ins. Co., 380 U.S. 438, 443–444, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965):

> " * * * the integrity of the administrative process requires that 'courts may not accept appellate counsel's post hoc rationalizations for agency action * * *.' Burlington Truck Lines v. United States, supra, 371 U.S. at 168 [83 S.Ct. at 246]; see Securities & Exchange Comm'n v. Chenery Corp. 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995]. For reviewing courts to substitute counsel's rationale or their discretion for that of the Board is incompatible with the orderly function of the process of judicial review. Such action would not vindicate, but would deprecate the administrative process for it would 'propel the court into the domain which Congress has set aside exclusively for the administrative agency.' Securities & Exchange Comm'n v. Chenery Corp., supra, [332 U.S.] at 196 [67 S.Ct. at 1577]."

This brings us to what petitioners refer to as the fundamental error, which affects virtually all of the Commission's cost determinations. They put it this way: The higher costs claimed by the Northern railroads were found to have been incurred in handling this specific traffic in issue, but when it came to determining the relative costs which were to control this divisional formula, the Commission in at least seven instances relied, not upon the actual costs incurred by the two groups of railroads on the traffic in issue, but upon the unadjusted average costs incurred by the railroads on the average of all traffic handled in their respective territories. The Commission's rebuttal to this assertion appears on Page 6 of the Commission's original brief:

> "In a comprehensive analysis rejecting seven of Southern lines' adjustments as unsound in concept or based upon unsupported inapplicable facts or assumptions, the Commission accepted the Rail Form A costs, as restated by it, as reliably and accurately reflecting the costs attributable to the handling of North-South traffic. Whether these costs were adequate and whether they should have been more refined or supplemented as plaintiffs desired, are questions of fact within the exclusive competence of the Commission to determine, which were determined here and are based upon substantial evidence of record."

The Northern lines insisted throughout the hearing that unadjusted Rail Form A [8] costs reliably and accurately reflect the costs attributable to the handling of the traffic at issue. Only a relatively few elements of the Northern railroads' average costs are higher than

---

**8.** Rail Form A is a formula for assigning the territorial or systemwide costs of operation including rents and taxes for any given year to the service units (ton-mile, car-miles, switching time, etc.) performed by the railroads during that year. This procedure assigns the costs as between those that are incurred in the origination and termination of a shipment, which are applicable to all shipments regardless of the distance of movement (terminal expenses), and those costs which are incurred in moving a shipment between the origin and destination points (line-haul expenses). It is adaptable for use in ascertaining the service unit costs of a single railroad or a group of railroads collectively. Territorial average costs here were based on the expanses and operations for 1956.

the Southern railroads' costs. It is uncontroverted on this record that most elements of railroads costs (such as operating trains, maintaining roadways, etc.) are no higher in Northern railroads than for the Southern railroads. The inflation in the costs is attributable to a relatively few cost items. These include the cost of commuter operations, the cost of interchanging cars, the ratio of empty to loaded cars, the cost of railroad freight cars, and a few other items. As to each of these controverted items, the Commission relied exclusively on territorial average costs (Rail Form A). This was pegged on a finding that Rail Form A costs were reliable and reflected the costs attributable to the handling of the specific traffic. The theory is that in broadly based proceedings and interterritorial division cases, the territorial costs are entitled without more to full credence and weight as the initial indication of what would be fair and equitable. The Commission concluded in each of these instances that Rail Form A provided more reliable data for application to the Official-Southern traffic than did the adjustments prepared by the Southern lines. The Commission took no independent action to require the development of more refined cost data. Typical of this approach is the conclusion made by the Commission, in disposing of petitioners' request for an adjustment of switching costs:

> "For these reasons, we conclude that the contentions of the northern lines are of merit and that Rail Form A territorial average switching costs more accurately measure the relative switching costs on each side of the border of the official-southern traffic than the switching costs computed by the southern lines." 325 I.C.C. at page 77.

Plaintiffs and intervening plaintiffs urge some 31 propositions as reflected in the Pre-Trial Order, but their briefs resolve them into 17 separate questions of which the great majority relate to the Commission's treatment of relevant service costs. These are:

1. Section 7(c) of the Administrative Procedure Act provides that "[T]he proponent of a rule or order shall have the burden of proof" (5 U.S.C. § 1006(c)); and this provision has been held to apply to proponents of changes in existing rate divisions. The Northern railroads here failed to satisfy their burden of proof, and the Commission failed to enforce that burden and thus violated Section 7(c) when it permitted the Northern railroads to rely entirely upon territorial average evidence, without showing that such averages were applicable to North-South freight traffic.

2. The Northern railroads had a duty to come forward with relevant evidence in their sole possession necessary to resolve the issues raised when the Southern railroads challenged the application of territorial average costs of all traffic to North-South traffic. The Commission erred in failing to enforce this duty and in holding instead that the absence of adequate and comparable evidence was a ground for resolving those issues against the Southern railroads.

3. The Commission has power to require the development of adequate and comparable cost data. Section 20(1) of the Act expressly grants the Commission the power to require the carriers to provide "full, true and correct answers to all questions upon which the Commission may deem information to be necessary" (49 U.S.C. § 20(1)). The Commission has a duty to use its powers to obtain cost evidence where such evidence is necessary to assure an adequate record. That duty was violated here as the Commission failed to take affirmative action to require the development of an adequate record as to the actual costs of handling the North-South traffic at issue.

4. Section 8(b) of the Administrative Procedure Act requires the Commission to "rule upon each * * * exception presented" (5 U.S.C. § 1007(b)). The Commission violated its statutory duty by failing to rule upon the Southern railroads' "Exception No. 1" dealing with the burden of proof, the duty of the

party in possession of relevant evidence to come forward with it and the power and duty of the Commission to require a complete record.

5. The Commission stated as its standard the costs of handling North-South freight traffic, its reliance upon territorial average costs caused it to include in the Northern costs, which it found, the Northern deficits from suburban commuter passenger service operations. This action constitutes a violation of both Sections 8(b) and 10(e) of the Administrative Procedure Act when judged against the standard stated by the Commission itself as governing in this case—that is, the relative costs of handling North-South freight traffic. The Commission made no reasoned findings and had before it no substantial evidence on which such a conclusion might be based. The lack of rational basis for the Commission's conclusion is highlighted by the Commission's own inconsistent finding that "many individual items of suburban service can be considered solely related * * * to suburban service" (325 I.C.C. at 78).

6. The Commission's prescription of divisions based on costs which include a separate allowance for "border interchange service" 58% higher for the North than for the South violates the requirement that the Commission's findings and conclusions be supported by substantial evidence within the meaning of Section 10(e) of the Administrative Procedure Act.

7. The Commission's action in using 32% higher car costs for the Northern railroads than for the Southern railroads violates Sections 8(b) and 10(e) of the Administrative Procedure Act since there were no reasoned findings to support that action, nor was there substantial evidence in the record to support such a finding.

8. Section 15(6) of the Interstate Commerce Act provides that in a divisions case the Commission is to determine the costs incurred by the respective railroads which are "applicable to the transportation of passengers or property," a determination which has nothing whatever to do with the financial results of car rentals. Since the Commission's finding of 32% higher Northern car costs is in substantial part of the product of the greater amount of car rentals received by the Southern railroads (on traffic other than North-South traffic), the Commission's action also violates Section 15(6) because it fails to differentiate the railroads' separate function as car-owning or renting agencies as compared with their function as transportation agencies.

9. The Commission's use of territorial averages in computing the "switching costs" of the Northern and Southern railroads rather than the specific costs incurred by those railroads with respect to North-South traffic is not supported by reasoned findings and not based on substantial evidence in the record and thus violates Sections 8(b) and 10(e) of the Administrative Procedure Act. In addition, the Commission's rejection of the Southern railroads' special studies of switching costs on the traffic at issue because there were no comparable studies of Northern costs constitutes a violation of Section 7(c) of the Administrative Procedure Act in that it places the burden of proof on the Southern railroads rather than the proponents of the Northern inflation who had the evidence in their sole possession.

10. The Commission's use of territorial average "empty return ratios" rather than the actual empty return ratios for the North-South traffic in issue also violates Sections 8(b) and 10 (e) of the Administrative Procedure Act because it is unsupported by reasoned findings and not based on substantial evidence in the record. This also violates Section 7(c) of the Administrative Procedure Act which puts the burden of proof on the proponent of change, and the principle that those in possession of relevant data are obliged to come forward with it.

11. The Commission's inconsistent counting of cars interchanged and terminated and its rejection of the Southern

railroads' attempts to correct that inconsistency violate the burden-of-proof provisions of Section 7(c) of the Administrative Procedure Act, the principle that those in possession of relevant evidence are obliged to come forward with it, and the obligation of the Commission to assure the making of an adequate record.

12. The Commission's use of territorial averages in dealing with the constant cost of transit commodities and its rejection of Southern adjustments designed to reflect the costs associated with North-South traffic also constitute violations of the burden-of-proof provisions of Section 7(c), the principle that those in possession of relevant evidence are obliged to come forward with it, and the obligation of the Commission to assure the making of an adequate record.

13. The "typical evidence rule" requires that there must be evidence typical in character and ample in quantity with respect to the divisions and services performed under the particular rate being divided. The Commission must consider evidence of actual services performed on particular traffic involved, and not rely wholly on averages which "are apt to be misleading." United States v. Abilene & Southern R. Co., 265 U.S. 274, at p. 291, 44 S.Ct. 565, 68 L.Ed. 1016 (1924); Atchison, Topeka & Santa Fe R. Co. v. United States, 225 F.Supp. 584, 592–600 (D.Colo.1964).

14. The Commission's departure from uniform divisions related to uniform rate levels is not supported by the reasoned explanation required by Section 8(b) of the Administrative Procedure Act.

*Other alleged errors are:*

15. The Commission's Supplemental Report invoked its quasi-judicial powers to decide this case as an aid to its executive function of defending its order before the Court. This resulted in an unconstitutional denial of notice and an opportunity to be heard. Atchison, T. & S. F. Ry. Co. v. United States, 231 F.Supp. 422, 428 (N.D.Ill.1964).

16. Section 7(d) of the Administrative Procedure Act (5 U.S.C. § 1006 (d)) requires that: "The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision * * *." The Due Process Clause of the Federal Constitution requires also that the Commission not go outside the record in reaching its decisions. The Commission violated both of these provisions when its use of its Cost Finding Section led it to rely on data not contained in the record in three separate instances.

17. The Commission's conclusion that the North suffers from inherent disadvantages in transportation conditions was supported by neither reasoned findings in the Commission's report as required by Section 8(b) of the Administrative Procedure Act, nor by substantial evidence, as contemplated by Section 10 (e) of that Act.

■■ Propositions 15 and 16 may be readily disposed of. The Commission's use of its Cost Section to give technical aid in analysis and evaluation of the cost evidence of record was an integral part of this administrative proceeding. This infringed the rights of no one.[9] The Commission's issuance of its supplemental report was lawful and proper and constituted sound administrative practice.[10] Moreover, in issuing its supplemental report the Commission did not change its outstanding order in any respect, except as to divisions of the Norfolk Southern Railway, which is not here challenged.

---

9. The Commission's use of its staff assistants was specifically approved in T.S.C. Motor Freight Lines, Inc. v. United States, 186 F.Supp. 777 (S.D. Tex., 1960), aff'd sub nom. Herrin Transp. Co. v. United States, 366 U.S. 419, 81 S.Ct. 1356, 6 L.Ed.2d 387 (1961).

10. Alamo Express, Inc. v. United States, 239 F.Supp. 694, 697, 698 (W.D.Tex., 1965), aff'd 382 U.S. 19, 86 S.Ct. 83, 15 L.Ed.2d 14; Donaldson v. Read Magazine, 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628 (1948).

Proposition 17 requires amplification. The failure to draw a clear line of demarcation between findings of fact, summaries, analyses and discussion had contributed heavily to the difficulty of reviewing this case. Intervening plaintiffs insisted before the Commission that for at least 30 years prior to this case, the Commission has consistently followed the view that primary responsibility for meeting the costs and revenue needs of any territory lies with the people and industry of that territory, and that deviation from the equal division factor now in effect can be justified under 15 (6) of the Act only if the higher costs found to exist are brought about by inherent territorial disadvantages. This is so, they say, because differences in cost which cannot be related to such inherent disadvantages might well be the product of nothing more than inefficiency or overcapacity on the part of one group of railroads. Plaintiffs insist that this was the express principle enunciated by the Supreme Court in State of New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492. The Commission was cognizant of this contention, which was the main thesis of intervening plaintiffs before the Commission, and handled it as follows:

> "Relying on [State of] New York v. United States, 331 U.S. 284, 315 (1947), the interveners also take the position that natural disadvantages must be found in the North before we may increase the divisions of the northern railroads. In essence, however, other factors being equal, cost differences generally are the product of, and reflect, the inherent advantages and disadvantages that go to make up the respective overall transportation conditions in the two territories." (Pgs. 27–28).

■■ Plaintiffs read this language as an implicit holding by the Commission that the North suffers from inherent territorial disadvantages and a recognition of their judicial construction of Section 15(6), (i. e.) that only cost differences related to inherent disadvantages should be permitted to serve as a basis for an increase in interterritorial divisions. Defendants' answer to this is that the Commission made no finding on this question at all and "were simply commenting on Intervenors' contention." Surely, the Commission report should be so phrased that there be no room for such a dispute as this. We have read the language carefully and we have some hesitation in saying which interpretation is correct. The question of whether a showing of inherent disadvantages is prerequisite to an increase in territorial divisions is, at least in the first instance, a question for the Commission. If, as petitioners read the report, the Commission has held that such a showing is necessary, then this Court need only consider whether in view of such a test, the requirements of reasoned findings and substantial evidence of Sections 8(b) and 10(e) of the Administrative Procedure Act have been met. If, on the other hand, as defendants contend, the Commission has made no holding on the question of inherent disadvantages, the Court must consider whether the Commission's failure to resolve the material issue raised with respect to that question can be reconciled with the express requirement of Section 8(b). We are considering not a restriction upon the statutory powers of the Commission to make divisions, but whether the Commission followed requirements of the Administrative Procedure Act. The Administrative Procedure Act requires findings on material issues of law. N. L. R. B. v. Hearst Publications, 322 U.S. 111, 64 S. Ct. 851, 88 L.Ed. 1170 (1944). If, as plaintiffs assert, the Commission has held that a showing of inherent disadvantages is a pre-requisite to an increase in territorial divisions, then the Commission's conclusion (that higher Northern costs reflect inherent territorial disadvantages) is subject to attack because there are no findings as to what these inherent territorial disadvantages consisted of. Intervening plaintiffs have consistently and strenuously made the contention that as a matter of law the

Northern railroads cannot have an increase in the absence of inherent territorial disadvantages. This case is to be remanded *for other reasons.* Upon remand, the Commission should decide and dispose of this contention in accordance with the Administrative Procedure Act.

The remaining exceptions to which we must address ourselves relate to cost evidence. Reduced to its simplest terms, the situation is this: All agree that the relevant costs are those of the North-South freight traffic to which the divisions apply. However, when it came to determining the relative costs which were to control this divisional formula, the Commission relied upon the actual costs incurred on the average of all traffic handled in the respective territories.[11] The Commission, as to each of seven specific items of unit cost (which account for the entire inflation) decided that the Northern lines established a prima facie case that Rail Form A costs properly measure the cost of the specific traffic.[12] In each instance the Southern lines introduced evidence and sought adjustments to reflect what they contended to be the actual cost of the specific traffic. In each instance the Commission rejected these adjustments, and employed Rail Form A territorial unit costs as accurately representing the cost of service. The Commission did not assume any responsibility for the development of a more adequate record, and in several instances held that the absence of comparable evidence in the record itself prevented adjustments in territorial averages.[13]

Typical of the overall approach of the Commission was its inclusion of suburban passenger deficits as a part of the cost of handling North-South traffic. Through the use of average costs, deficits attributable to both inter-city passenger service and suburban commuter service were included in cost computations. It is generally agreed that the inter-city passenger deficits should be considered as a part of the cost of providing freight service, because such deficits are usually the product of costs allocated to passenger operations from common facilities which must be maintained in order to provide freight service.[14] Suburban (commuter) deficits are in a different category. The railroads, which on today's market carry large numbers of people from their homes in the suburbs to their place of work in the cities, often, if not preponderantly, use separately constructed and maintained lines. These suburban commuter operations require equipment and facilities that in many instances have no other use whatsoever. The reason stated by the Commission for the inclusion of commuter deficits is that "the suburban service deficit includes common costs" which must be incurred to provide freight service (325 I.C.C. at p. 78). But the Commission also found as a fact that "many individual items of suburban service can be considered solely related * * * to suburban serv-

11. The North-South traffic in issue constitutes on 6.0% of the total freight revenue of the Northern railroads, and constitutes 21.4% of the total freight revenue of the Southern railroads (V.S. 36, Ex. 5).

12. The Northern lines presented a train utilization study, which revealed that of the total of 13,647 loaded trains shown for five study lines for a selected week in May of 1959, 6,099 trains representing 44.7% were found to be transporting at least one loaded car moving from or destined to Southern territory.

13. For instances in which evidence of the Southern railroads was rejected for lack of "comparable" data for the North, see 325 I.C.C. at 69 (refrigerator car empty

return ratios); 325 I.C.C. at 76; 325 I.C.C. at 60. The same result was reached due to an absence of "adequate" data at 325 I.C.C. at 66 (box car empty return ratios).

14. The necessity for maintaining common facilities for frieght service was explained by the Supreme Court in King v. United States, 344 U.S. 254, 265, 73 S.Ct. 259, 266, 97 L.Ed. 301 (1952):

"In Florida, moreover, the discontinuance of railroad passenger service would not permit the discontinuance of high-speed tracks and equipment because of the need for fast freight schedules to transport perishable fruits and vegetables from Florida."

ice." 325 I.C.C. at p. 78. This latter finding seems to be a concession that many commuter facilities are solely related to that service and have nothing whatsoever to do with the cost of handling North-South traffic or any other freight traffic. The critical issue on this cost item was to determine how much of the railroad's cost of commuter service was in fact common with the cost of freight service and how much was solely related to commuter service. But, in accordance with its general approach to these issues, the Commission, by adopting Rail Form A, inflated the Northern railroads' freight cost by the entire commuter deficit of those railroads, without regard to the plain conflict between this action and its own finding that "many individual items of suburban service can be considered solely related * * * to suburban service." Counsel for defendants, during argument, repeatedly suggested that the commuter deficits are properly chargeable to the traffic at issue as an "overhead." They argued:

" * * * there has been a definite theory upon which the Commission has allocated these costs as a matter of policy, and that is that there is a need for that revenue to continue operations."

The complete answer to this contention is that the Commission did no such thing. The revenue need issue was hotly contested before the Commission, each group contending that its needs were greater— the Northern railroads, on the basis of lower rates of return; the Southern railroads, on the basis of their growing service responsibilities to an expanding economy. The Commission rejected both contentions, and categorically stated:

"We find that no affirmative reasons appear in this record which would warrant any adjustment of the divisions in question over and above the relative cost of service, either on the grounds of greater revenue needs or otherwise."

There is no finding rationalizing the conclusion that suburban passenger deficits reflecting costs not common to freight service, but "solely related" to suburban passenger service, can or should be treated as cost of North-South freight traffic.

The Supreme Court, on May 29, 1967, in the cases of Chicago and N. W. Ry. Co. v. Atchison, T. and S. F. R. Co., and United States v. Atchison, T. and S. F. R. Co., 387 U.S. 326, 87 S.Ct. 1585, 1599, 18 L.Ed.2d 803 (October Term, 1966) commented on a possible divisions case, where, as here, it is argued that carriers in one part of the country are being required to subsidize passenger operations elsewhere. There, it was said:

"And while the Commission has sometimes acted to offset passenger deficits in freight rate cases, the issues are quite different when, in a divisions case, it is argued that carriers in one part of the country should subsidize the passenger operations of carriers elsewhere.

"If the Commission were to give controlling weight to passenger deficits in a divisions case, it might be appropriate to take more evidence on the issue and discuss it in greater depth than the Commission did here. But in light of the fact that, in this case, passenger deficits were of negligible relevance to the Commission's decision to increase the Midwestern divisions, we find no errors in the Commission's findings and procedure on this point that would justify setting aside its order."

Another example of the Commission's approach is characterized by its use of territorial average box car empty return ratios. The nature of this problem is summarized in the dissenting opinion of Commissioner Murphy (325 I.C.C. 54, 55):

"The higher than average empty return ratios used for cars moving over the official lines is another instance where true costs have not been used. The official lines handle approximately 800,000 carloads of automobile parts annually which originate in the Detroit, Mich., area and are destined to assembly plants in various parts of the

country, including New Jersey, California and Georgia. Many of these cars are fitted with special devices to protect the automobile parts in transit. Because these cars carrying parts contain special devices and are assigned to particular plants manufacturing such parts in official territory, they normally experience an empty return movement which is, for all practical purposes, 100 percent. No adjustment is made in the cost data to cover the higher empty return costs of this type of equipment. Territorial average box car empty return ratios, as used in the report, overstate the costs of the official railroads when applied to Official-Southern traffic."

Another example of the general approach of the Commission is illustrated in its treatment of the issue of "Switching costs" (325 I.C.C. 71–78). The specific cost factor was the amount of the switching service actually performed in originating and terminating the traffic at issue. The Northern railroads placed their entire reliance upon the territorial average switching service for the average car in each territory.[15] The Southern railroads sought to develop the costs associated with the specific traffic in issue. In the face of these special studies, the Northern railroads continued to rely upon Rail Form A switching costs, which were substantially higher in the North. In its cost findings on this point, we repeat the Commission's finding at 325 I.C.C. 77:

"* * * the contentions of the Northern lines are of merit and that Rail Form A territorial average switching costs more accurately measure the relative switching costs on each side of the border of the Official-Southern traffic than the switching costs computed by the Southern lines."

 Although important as separate issues, the three items heretofore detailed are of greater significance as illustrations of the more pervasive error of the Commission in prescribing divisions on the basis of the average cost of all traffic for this series of important elements of cost which are higher in the North for reasons that have not been shown to have any relation to the North-South freight traffic here at issue. We are not suggesting that one might not dig out of the record argumentative support for the Commission's view, but it is not conducive to a fair administration of the Commerce Act, nor is it a proper discharge of this Court's duty, to require us to dig out indications of evidence from this massive record.

 Defendants argue that the question of whether or not Rail Form A was representative, and whether it should have been supplemented are questions of fact, the determination of which is within the competence of the Commission. We start, of course, from the premise that on the subject of transport economics, the Commission's judgment is entitled to great weight. The appraisal of cost figures is itself a task for experts and, unlike a problem in mathematics, it cannot be precisely right or wrong. We know, too, that the Rail Form A cost formula was devised for the express purpose of measuring territorial average costs and has been widely used as an acceptable means of comparing relative transportation costs. It represents a comprehensive study entitled to full weight when the issue is one that it was designed to cover. However, this formula was designed to measure the cost of handling all the traffic in two or more territories, and cannot appropriately be accepted without further evidence for mechanical application to particular segments of traffic in a divisions case. The "many minute calculations" contained in Rail Form A were used to measure the overall average costs and certainly produce a misleading appearance of exactitude when applied mechanically to measure a specific cost of a specific body of traffic such as that involved here. Evi-

15. The North-South traffic constitutes only 4.07% of the total cars originated and terminated in the North and 8.93% of the total cars originated and terminated in the South.

dence of overall territorial averages surely can and should be considered, but as to specific important cost items the Commission should not wholly and exclusively rely on such averages. United States v. Abilene and Southern R. R. Co., 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016; Atchison, Topeka and Santa Fe Ry. Co. v. United States, D.C., 225 F.Supp. 584. The Commission stated its exclusive standard to be the relevant cost of handling the specific freight traffic to which the divisions apply. We are persuaded that the order is not based on substantial evidence nor supported by reasoned findings within the meaning of Section 8(b) and 10(e) of the Administrative Procedure Act because the use of territorial averages accounting for the Northern inflation has not been supported with findings or evidence relating any such inflation to the North-South freight traffic.

What is appropriate in one case may be inappropriate in another. We do not hold that the Commission was required to start from scratch and construct a new divisional scale directly from cost data. We do find that, having stated its exclusive standard to be the relevant cost of handling the freight traffic to which the divisions apply, the Commission's order is not based on substantial evidence within the meaning of the Administrative Procedure Act. We note that in the Chicago and N. W. R. Co. case (supra, Supreme Court of the United States, May 29, 1967), disputes over the applicability of Rail Form A occupied a large part of the administrative proceedings. There, the Commission based its cost findings on a special cost study and analysis prepared by the Mountain-Pacific carriers and made certain adjustments which it considered more accurately reflected the true costs of the traffic

involved. These adjustments (3) were derived from Rail Form A. The Supreme Court held that the attack on the legal validity of these adjustments to costs were unsubstantial. Here, of course, the entire inflation is pegged on relative costs derived from Rail Form A.

With the Commission's expertise in mind, it is our duty to review the record and the conclusions reached, as required by the provisions of the Administrative Procedure Act. As to the sufficiency of the evidence to support the order, it is not the proper function of this Court to substitute its judgment or to weigh evidence.[16] On the other hand, it is our duty to ascertain whether or not the findings and conclusions are supported by substantial evidence. We have endeavored to review the record without a rubber stamp approach. We repeat and reiterate that in making our decision we are not unmindful of the function that the Interstate Commerce Commission is to perform and the discretion that it has. The Commission has had a hard and difficult task here. The record reveals that this facet of this case began in 1956 and that the report and order of the Commission was not issued until February 3, 1965. This in itself certainly suggests the magnitude of the problem which faced the Commission.

"Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion.' "[17] In 1953, in recognition of its previous action in prescribing a uniform rate level, the Commission prescribed divisions on a uniform basis with no inflation for either Northern or

16. Illinois Commerce Comm. v. United States, 292 U.S. 474, 484, 54 S.Ct. 783, 78 L.Ed. 1371 (1933); Boston and Maine R.R. v. United States, 153 F.Supp. 952 (D.C.Mass., 1957); see Nashua Motor Exp., Inc. v. United States, 230 F.Supp. 646 (D.C.N.H.1964); J. B. Acton, Inc. v. United States, 221 F.Supp. 174 (W.D. Mo.1963), aff'd, 376 U.S. 779, 84 S.Ct. 1133, 12 L.Ed.2d 83 (1963).

17. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

Southern railroads and concluded that (287 I.C.C. at 526):

" * * * We consider it to be the safest assumption for the future upon the facts before us that neither contesting group will have an appreciably lower basis of operating costs than the other, and that there are no other relevant circumstances which are of sufficient importance to justify higher divisional factors for one group than the other."

Furthermore, for many years prior to this case the Commission has consistently followed the view that the primary responsibility for meeting the cost and revenue needs of the railroads of any territory lies with the people and the industry of that territory. New England Divisions, 126 I.C.C. 579, 599 (1927); Divisions of Rates, Official and Southern Territories, 234 I.C.C. 175, 190 (1939); Official-Southern Divisions, 287 I.C.C. 497, 523 (1953); Akron, Canton & Youngstown R. Co. v. Atchison, T. & S. F. Ry. Co., 321 I.C.C. 17, 51 (1963). In this very case, prior to reopening, the Commission held that the primary division of revenues accruing from this traffic were to be made on an equal-factor scale. We recognize that the Commission is not perpetually bound by their 1953 holding, but we do believe that the Commission has special responsibilities in a case of this magnitude when it departs from its prior finding (Secretary of Agriculture of U. S. v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015.) The Commission's duty to use its powers to obtain cost evidence where such evidence is necessary to assure an adequate record was stressed in Pacific Inland Tariff Bureau v. United States, 129 F.Supp. 472, 486 (D.C. Or., 1955):

"The Commission is not a passive arbitrator of disputes between carriers. It is the instrument chosen by Congress to regulate interstate commerce in the public interest. When carriers fail to produce satisfactory evidence, the Commission may require them to produce additional and more satisfactory evidence. It may make its own investigation. It may consult with 'other interested and presumably better informed agencies of the Government as to particular question.' Cantlay & Tanzola, Inc. v. United States, [D.C.,] 115 F.Supp. [72,] 81. However, the record does not disclose that any of those courses was followed in this case. *The fate of our national transportation system should not depend upon evidence either offered or withheld by competing carriers.*" (Emphasis added)

The same principle was reiterated recently by the Second Circuit in Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2nd Cir. 1965). There, the Court set aside an order of the Federal Power Commission, saying (354 F.2d at 620):

"In this case, as in many others, the Commission has claimed to be the representative of the public interest. This role does not permit it to act as an umpire blandly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission.

"This court cannot and should not attempt to substitute its judgment for that of the Commission. But we must decide whether the Commission has correctly discharged its duties, including the proper fulfillment of its planning function in deciding that the 'licensing of the project would be in the overall public interest.' The Commission must see to it that the record is complete. The Commission has an affirmative duty to inquire into and consider all relevant facts. See Michigan Consolidated Gas Co. v. Federal Power Comm'n, 108 U.S.App.D.C. 409, 283 F.2d 204, 224, 226, cert. denied, 364 U.S. 913, 81 S.Ct. 276, [5 L.Ed.2d 227] (1960); Isbrandtsen Co. v. United States, 96 F.Supp. 883, 892 (S.D. N.Y.1951), aff'd by an equally divided court, A/S J. Ludwig Mowinckels Rederi v. Isbrandtsen Co., 342 U.S. 950, 72 S.Ct. 623, 96 L.Ed. 706 (1952);

Friendly, The Federal Administrative Agencies, 144 (1962); Landis, The Administrative Process, 36–46 (1938); cf. City of Pittsburgh v. Federal Power Comm., 99 U.S.App.D.C. 113, 237 F.2d 741 (1956)."

There is no doubt as to the Commission's statutory powers to require the development of adequate and comparable cost data. Section 12(1) of the Interstate Commerce Act authorizes the Commission to "obtain from such carriers and persons such information as the Commission deems necessary to carry out the provisions of [the Act]" (49 U.S.C. § 12(1)). Section 20(1) of the Act expressly grants the Commission the power "to require * * * special reports from carriers" and to require the carriers to provide "full, true and correct answers to all questions upon which the Commission may deem information to be necessary" (49 U.S.C. § 20(1)). This power was sustained in Baltimore & O. R. Co. v. ICC, 221 U.S. 612, 621, 31 S.Ct. 621, 55 L.Ed. 878 (1911).

■ The Commission in this case never mentioned or, for all that appears, even considered the possibility of developing a record on the specific cost at issue, but merely relied upon unadjusted territorial average costs to reflect the average cost of the traffic at issue. The Commission is not expected to merely call balls and strikes. The ICC is not the prisoner of the parties' submissions. It is empowered to investigate and gather evidence beyond that presented where exercise of that power is necessary to supplement the record and is in the public interest. The record here does not show, except in nebulous fashion, that the cost figures represent anything but the overall average territorial costs and they certainly are not computations of cost figures of the particular movements here involved. The ICC has tools to assemble complete factual records, it employed virtually none of them in this extremely important proceeding. (See Justice Brennan's concurring opinion in the Railroad merger cases, Baltimore & Ohio R. Co. v. United States, 386 U.S. 372, 87 S.Ct. 1100, 18 L.Ed.2d 159, decided March 27, 1967).

This opinion has been rather lengthy and includes findings and conclusions. By way of repetition and emphasis we add the following specific conclusions:

## CONCLUSIONS OF LAW

1. This Court has jurisdiction, under 5 U.S.C. § 1009 and 28 U.S.C. §§ 1336, 2284, 2321–2325, to suspend, enjoin, annul and set aside the enforcement, operation and execution of orders of the Interstate Commerce Commission.

2. The venue of this action is properly laid in the Eastern District of Louisiana under 28 U.S.C. § 1398.

3. The Commission has power to require the development of adequate and comparable cost data. Section 20(1) of the Act expressly grants the Commission the power to require the carriers to provide "full, true and correct answers to all questions upon which the Commission may deem information to be necessary" (49 U.S.C. § 20(1)). The Commission has a duty to use its powers to obtain cost evidence where such evidence is necessary to assure an adequate record. That duty was violated here as the Commission failed to take affirmative action to require the development of an adequate record as to the actual costs of handling the specific traffic at issue.

4. The Commission stated as its standard the costs of handling North-South freight traffic, but reliance upon territorial average costs caused it to include in the Northern costs deficits from suburban commuter passenger service operations. This action constitutes a violation of both Sections 8(b) and 10 (e) of the Administrative Procedure Act when judged against the standard stated by the Commission itself as governing in this case—that is, the relative costs of handling North-South freight traffic. The Commission had before it no substantial evidence on which such a conclusion might be based. The lack of rational basis for the Commission's conclusion is highlighted by the Commission's own inconsistent finding that "many individ-

ual items of suburban service can be considered solely related * * * to suburban service (325 I.C.C. at 78).

5. The Commission's use of territorial averages in computing the "switching costs" of the Northern and Southern railroads rather than the specific costs incurred by those railroads with respect to North-South traffic is not supported by reasoned findings and not based on substantial evidence in the record and thus violates Sections 8(b) and 10(e) of the Administrative Procedure Act.

6. The Commission's use of territorial average "empty return ratios" rather than the actual empty return ratios for the North-South traffic in issue also violates Sections 8(b) and 10(e) of the Administrative Procedure Act because it is unsupported by reasoned findings and not based on substantial evidence in the record.

7. The "typical evidence rule" requires that there must be evidence typical in character and ample in quantity with respect to the divisions and services performed under the particular rate being divided. The Commission must consider evidence of actual services performed on particular traffic involved, and not rely wholly on averages which "are apt to be misleading." Here, the Commission relied on "unsifted averages." United States v. Abilene & Southern Railroad Co., 265 U.S. 274, at p. 291, 44 S.Ct. 565, 68 L.Ed. 1016 (1924); Atchison, Topeka & Santa Fe R. Co. v. United States, 225 F.Supp. 584, 592–600 (D.Colo.1964).

## CONCLUSION

We are not unmindful of the complicated nature of this problem. However, when the outcome of factual issues is bound to cut deeply into economic relations on such a scale and when the result involves a departure from an equal division formula previously adopted, it is appropriate to remand the case to the ICC for further study, followed by an explicit development of a record to assure adequate and comparable evidence with respect to the cost of the specific traffic at issue.

With the passage of each year, the 1959 test year adopted here becomes more and more vulnerable to the charge of staleness. It therefore has less and less to recommend it as a reliable basis upon which to predicate a division order. We make this observation not to indicate that it would necessarily be an abuse of discretion for the Commission not to re-open the investigation to receive later operating figures, but as a suggestion that such a re-opening well might be warranted.

The Commission Order, in its entirety, should be set aside and the cause remanded to the Commission for further proceedings consistent with the views expressed herein.

Counsel for plaintiffs will prepare and submit an appropriate decree in conformity with this opinion.